UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
                                                            :
  DOORDASH, INC.,                                           :
                                                            :
                        Plaintiff,                          :
                                                            :
      -against-                                             :
                                                            :
  CITY OF NEW YORK,                                         :
                                                            :
                        Defendant.                          :
                                                            :
------------------------------------------------------------x
```

No.  **21-cv-7695**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff DOORDASH, INC., by and through its attorneys, Gibson, Dunn & Crutcher LLP, alleges for its complaint against Defendant CITY OF NEW YORK, as follows:

## <u>NATURE OF THE ACTION</u>

1.     Over emphatic objections by more than 5,400 New York City consumers and a broad range of civil rights, privacy, technology, and other community groups, New York City enacted an unprecedented ordinance that requires certain third-party food ordering and delivery platforms, such as DoorDash, to disclose their customers' sensitive, personal information to restaurants (the "Ordinance"). [1]  The Ordinance imposes virtually no restrictions on what restaurants may do with that data, and it does not mandate any data-security requirements once the customer data is transferred to restaurants.  Under this unconstitutional law, every time a customer places an order with DoorDash for pickup or delivery from a restaurant, the Ordinance forces DoorDash to divulge that customer's name, telephone number, email address, delivery address, and order contents to any restaurant that requests the data unless the customer expressly and repeatedly opts out on an order-by-order basis.  In an era of heightened concerns about data privacy and identity theft, this compelled disclosure is a shocking and invasive intrusion of consumers'

---

[1]    NYC Int. No. 2311-A (adding section 20-847.3 to subchapter 22 of chapter 5 of title 20 of the New York City Administrative Code).

privacy.  It is also an unconstitutional compulsion of speech in violation of the First Amendment, an unconstitutional taking of DoorDash's valuable commercial information, an unconstitutional impairment of private parties' contractual bargains, and a flagrant violation of other constitutional rights.

2.      The Ordinance undermines New York City residents' privacy.  Many customers entrust established, respected technology companies like DoorDash with sensitive personal data that they would not entrust to small businesses that do not have similar robust data safety and security protocols.  Indeed, in-person diners do not expect to disclose to restaurants the kind of sensitive personal information that the Ordinance requires DoorDash to disclose.  As privacy advocates warned the City during hearings on the Ordinance, customers will face a serious risk of harm from their personal data being shared with every restaurant that fulfills their order on DoorDash's platform.  Moreover, the Ordinance's presumption that every customer consents to sharing their personal data—unless they specifically opt out on a per-order basis—flies in the face of prevailing privacy best practices.  As one City Council Member explained in opposing this "anti-consumer bill," customers do not ordinarily "read through the opt-out questions before they just, [say] no, let's keep going, let's just get my order in."  Ex. 9 at 15–16 (July 29 Committee hearing transcript).  The Ordinance allows all restaurants to obtain this private customer data, whether or not they have the technical capacity or resources to safely maintain it.  As privacy-focused organizations like the Electronic Frontier Foundation and Tech:NYC explained, the bill irrationally assumes, without any investigation or findings, that restaurants have the technical capacity to download customer data and store it in a way that will prevent unauthorized access and comply with complex privacy laws.  Of course, not all restaurants will have the resources to invest in a secure operating system to keep this information protected against modern ransomware and other cyber threats—or even to maintain access controls to ensure that customers' personal information is used only for the restaurant's business purposes.

3.      The Ordinance's forced data disclosures could also imperil the physical safety of vulnerable communities in New York City.  For this reason, the New York City Hispanic Chamber

of Commerce raised significant concerns with the Council ahead of the Ordinance passing, stating in a letter to Council Members that "we are deeply distressed about this bill's potential impact on more vulnerable populations, especially undocumented customers," and noting that the "lack of data security and amount of data being shared will put this community in danger." Cindy Rubi Estrada, *New York City Hispanic Chamber of Commerce Letter to Protect Consumers and Businesses*, Harlem World Mag. (July 27, 2021), https://bit.ly/3yw7f6U. The Haitian American Caucus raised similar concerns about the Ordinance, explaining that "many of our members are immigrants and are already facing hardships around surviving in New York City without permanent residency or citizenship status," and the Ordinance "has more risks than benefits" because it forces the disclosure of personal information without "requir[ing] restaurants to keep that information safe"—meaning the customer data could "be shared with government organizations, printed and left out on a countertop, or handed to discriminatory groups who wish our community harm." Sam Pierre, *Op-Ed: Council's data bill will harm vulnerable New Yorkers*, AMNY (July 27, 2021), https://bit.ly/3A7XXji. The National LGBT Chamber of Commerce also noted in a letter to City Council Speaker Corey Johnson that "this legislation is particularly problematic for a community that has already faced heightened risk in navigating confidentiality and security in an online environment." Matt Tracy, *Council Passes Restaurant Data Sharing Bill Opposed By GMHC, NGLCC*, GayCityNews (July 29, 2021), https://bit.ly/3mNHAES.

4.      City Council Members who supported the Ordinance claimed these risks to New York City residents were worth it because restaurants need help—despite conceding that DoorDash had fostered a mutually beneficial relationship with New York City restaurants for years. Restaurants that partner with DoorDash receive far greater marketing exposure to a wider audience than restaurants that do not. And DoorDash offers restaurants a range of products and services, including options which allow restaurants to foster direct relationships with their customers in a manner that does not pose the same privacy risks as the Ordinance. DoorDash's Marketplace platform is a web- and app-based platform that facilitates pickup and delivery. DoorDash spends millions of dollars to market this service to consumers, who then spend money

with local restaurants.  DoorDash's Storefront, meanwhile, enables restaurants to take orders for pickup and delivery via DoorDash directly on the restaurants' own websites.  When restaurants use Storefront, they maintain a direct relationship with customers, who knowingly consent to providing their personal information to restaurants.

5.    Despite DoorDash's commitment to serving New York City residents and restaurants, New York City enacted the Ordinance to disrupt DoorDash's business model by forcing DoorDash to disclose sensitive customer data at restaurants' request.  The City has made clear that the Ordinance's purpose is to reduce DoorDash's profitability—or remove DoorDash from the equation altogether—and to allow restaurants to free-ride on DoorDash's confidential, commercially valuable data.  The Ordinance reflects naked animus toward third-party platforms.

6.    The Ordinance's means are just as unlawful as its ends.  The Ordinance violates DoorDash's First Amendment rights by compelling it to speak a particular message it otherwise would not speak—namely, the disclosure of its sensitive business information.  It forces DoorDash to divulge its trade secrets with no compensation.  It substantially impairs DoorDash's existing contracts with thousands of New York City restaurants, upsets the contracting parties' settled expectations, and advances an illegitimate goal of economic protectionism.  It has the effect of regulating only large, out-of-state platforms while exempting small, local platforms from the disclosure requirement.  And it favors special interests in a manner completely untethered from any legitimate public health, safety, or welfare concern.

7.    The Ordinance is also likely to backfire.  Restaurants will use DoorDash's trade secret data to compete directly with DoorDash, forcing DoorDash to modify its services in a way that will result in fewer resources being offered to restaurants, fewer earnings opportunities for delivery couriers, and fewer choices for New York City customers.

8.    Accordingly, through this Complaint, DoorDash seeks declaratory relief, preliminary and permanent injunctive relief, and damages on the grounds that the Ordinance violates:

a. The First Amendment of the United States Constitution and Article I, Section 8 of the New York Constitution;

b. The Contract Clause of the United States Constitution;

c. The Takings Clauses of the Fifth Amendment to the United States Constitution and Article I, Section 7 of the New York Constitution;

d. The Dormant Commerce Clause of the United States Constitution;

e. Article IX, Section 2(c) of the New York Constitution and related statutes (Police Power);

f. The Fourteenth Amendment to the United States Constitution and Article I, Section 6 of the New York Constitution (Due Process); and

g. The Fourteenth Amendment to the United States Constitution and Article I, Section 11 of the New York Constitution (Equal Protection).

9. In pursuing this action, DoorDash seeks to vindicate the deprivation of its federal constitutional rights under color of state statute, ordinance, regulation, custom, and/or usage. Thus, DoorDash seeks damages and other relief under 42 U.S.C. § 1983. DoorDash also is entitled to attorneys' fees and expert fees if it prevails on any of its Section 1983 claims. *See* 42 U.S.C. § 1988(b).

## PARTIES

10. Plaintiff DoorDash, Inc. is a Delaware corporation founded in 2013 and headquartered in San Francisco, California. DoorDash is a technology company with the mission to grow and empower local economies. New York City customers who use DoorDash enjoy the convenience of thousands of local restaurants at their fingertips, often discovering new restaurants and ordering from an array of establishments over time. Since day one, DoorDash's mission has been to empower local businesses by providing access to e-commerce. Its platforms (including the DoorDash and Caviar platforms) connect customers, a broad array of restaurants, and in some cases delivery couriers, each of whom is affected by the Ordinance. DoorDash offers several options to restaurants, including Marketplace (DoorDash's web- and app-based platform that

facilitates pickup and delivery), where customers directly interact with the DoorDash platform to place orders with restaurants. Where merchants seek to have a direct relationship with customers and obtain customer information, DoorDash offers Storefront (an application that enables restaurants to create a branded online store to facilitate pickup and delivery from their own website) and Drive (a platform that facilitates delivery of orders originating outside the Marketplace in exchange for a flat fee).[2]

11.     Defendant City of New York (the "City" or "New York City") is a municipal corporation organized and existing under and by virtue of the laws of the State of New York.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 over DoorDash's federal constitutional claims, and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining claims. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332.

13.     DoorDash brings this action as both a facial challenge and an "as-applied" challenge to the Ordinance, and is excused from exhausting any administrative remedy before the City. DoorDash alleges that the Ordinance is invalid (1) on its face, (2) as applied to DoorDash, and (3) as applied to DoorDash's contracts with New York City restaurants and customers.

14.     Venue is proper in this Court because the Ordinance was enacted by the New York City Council, and the violations of DoorDash's rights occurred in this judicial district.

## FACTUAL ALLEGATIONS

**A.      DoorDash Offers Valuable Marketing And Other Services To Restaurants In Exchange For Agreed-Upon Fees**

15.     DoorDash operates a third-party platform in New York City and elsewhere that empowers hundreds of thousands of small businesses such as restaurants by connecting them with customers who wish to purchase items and have them delivered or be ready for pickup by the

---

[2]     Except as otherwise noted, references to DoorDash's "platform" throughout this Complaint refer to DoorDash's Marketplace platform.

customer.  Customers can access the platforms via DoorDash's website or DoorDash's application on a smartphone.

16.    Other third-party platforms operating in New York City and elsewhere in the United States include Uber Eats, Postmates, Grubhub, Delivery.com, and Slice, among others. Because DoorDash competes with many other companies, it has powerful market-based incentives to offer the best overall value proposition—including marketing tools—to restaurants.

17.    Prior to the rise of third-party platforms, restaurants often engaged in their own marketing to both existing and potential first-time customers.  Such marketing often took the form of street signs; billboards; newspaper, magazine, or online advertisements; or websites that restaurants created and managed themselves.  Restaurants also directly marketed to specific customers who voluntarily provided restaurants with their contact data, such as an email or mailing address.  Restaurants remain free to continue marketing in all of these ways whether or not they now also use third-party platforms.

18.    The rise of third-party platforms like DoorDash has resulted in the expansion of restaurants' customer bases.  Customers who otherwise would not have patronized a restaurant in person or would not have discovered a restaurant but for DoorDash's platform use DoorDash to purchase food from that restaurant to be delivered or picked up.  A 2020 survey found that more than two-thirds of surveyed restaurant operators now rely on DoorDash to grow revenue and reach new customers.

19.    DoorDash offers a variety of marketing options to restaurants, and restaurants are able to choose the level of marketing they determine is best for their business.  For example, restaurants can advertise within DoorDash's web- and app-based Marketplace platform, or they can use DoorDash's Storefront platform to create a branded online store to enable pickup and delivery from their own website.  Many restaurants recognize the value of DoorDash's marketing tools and choose to pay for greater marketing capabilities.  DoorDash has spent tens of millions of dollars on marketing to enable New York City restaurants to expand the reach of their menus to new customers because when restaurants survive and succeed, so does DoorDash.

20.     Beyond marketing, DoorDash offers many other valuable services like facilitating food delivery and pickup, order processing, customer support, and technology and product development.  Restaurants are free to leave DoorDash's platform for any reason, and they are free to perform any of these services on their own rather than pay DoorDash to do so.

21.     One way DoorDash generates revenue to cover its costs is through commissions charged to restaurants, which are agreed upon through contracts signed by the restaurant and DoorDash.  These commissions represent a substantial part of DoorDash's revenue streams.

22.     The operational costs that DoorDash incurs include (but are not limited to):

   a.  Marketing of DoorDash's services to customers, including promotions and advertising to drive demand to local restaurants;

   b.  Platform development, maintenance, and operation;

   c.  Procurement and development of technology, including for payment processing, order management, application maintenance, and dispatching technology;

   d.  Procurement and development of restaurant-dedicated products, including products to manage promotions, order volume, and menu management;

   e.  Onboarding delivery couriers, including background checks for every courier on DoorDash's platform;

   f.  Ensuring delivery couriers earn fair compensation for their work; and

   g.  Dedicated customer service specialists to provide support to restaurants, couriers, and customers for orders placed through DoorDash's platform.

23.     DoorDash's contracts with restaurants for the Marketplace generally use a flexible percentage commission structure such that restaurants pay DoorDash only when they receive an order through the DoorDash website or mobile application.  DoorDash has contracts with over 16,000 restaurants in New York City.  The vast majority of DoorDash's contracts with New York City restaurants have been long-term (though such contracts are generally terminable at will). Restaurants have significant flexibility in how they partner with DoorDash.  During the COVID-

19 pandemic, DoorDash adopted a flexible three-tier Marketplace pricing model that provides restaurants several partnership plan options at different price points, depending on the products and services best suited to each restaurant's needs. DoorDash's commission rates have generally remained the same or decreased since the COVID-19 crisis began.

**B.    DoorDash Provides Restaurants With The Customer Data Necessary To Fulfill Orders**

24.    Customers who sign up to use DoorDash's platform are required to provide certain personal data to DoorDash, including their first and last name, telephone number, email address, and (in the case of delivery orders) delivery address, in order for DoorDash to facilitate the services it provides.

25.    To protect the privacy of customers' personal data and to maintain the confidentiality of its trade secrets, DoorDash is careful not to disclose any more data to merchants about customers who use its platform than necessary to complete the transaction. For example, DoorDash has generally taken measures to ensure the only customer data it shares with restaurants is the first name, last initial, and order contents of customers who place an order with that restaurant—enough data for the restaurant to properly fulfill the order, while protecting consumer privacy. DoorDash's practice of sharing only customers' first name, last initial, and order contents has been longstanding, and DoorDash has never had a policy of sharing customers' telephone numbers, email addresses, or delivery addresses with restaurants without the customer opting in to such sharing—a practice that DoorDash customers expect and value.

26.    DoorDash clearly explains this policy to customers. It requires every customer who uses the DoorDash platform to agree to its Terms and Conditions. *See* Ex. 1. The Terms and Conditions incorporate DoorDash's Privacy Policy, which informs customers that DoorDash "collect[s] profile data associated with your Customer DoorDash account. This includes information such as name, email address, delivery address, and phone number." Ex. 2 § 1(a). The Privacy Policy further provides that DoorDash "may share information with [restaurants] to facilitate deliveries such as your first name and last initial and order information related to your

9

orders with DoorDash merchants." *Id.* § 4(b). The Privacy Policy does not state that DoorDash may share any other types of data—including data the Ordinance requires to be disclosed—with restaurants or other merchants. Thus, the Ordinance would require DoorDash to disclose data that DoorDash otherwise would not disclose under its Privacy Policy.

27. DoorDash's standard restaurant-facing Terms of Service (to which all of DoorDash's restaurant partners, with limited exceptions, must agree) underscore that customer data will be kept confidential except that which is necessary to fulfill an order.[3] The Terms of Service define "DoorDash Data" as "any information that DoorDash provides or makes accessible to [the restaurant] through the DoorDash Platform, including without limitation Personal Information." Ex. 3 § 1(c). "Personal Information" is defined as "any information exchanged under this Agreement that (i) identifies or can be used to identify an individual (including without limitation, names, telephone numbers, addresses, signatures, email addresses or other unique identifiers); or (ii) that can reasonably be used to authenticate an individual (including without limitation, name, contact information, precise location information, access credentials, persistent identifiers and any information that may be considered 'personal data' or 'personal information' under applicable law)." *Id.* § 1(w). Both DoorDash Data and Personal Information constitute "Confidential Data," meaning that (subject to limited exceptions) restaurants may not "access or use" DoorDash Data or Personal Information "other than as necessary to exercise its rights or perform its obligations in accordance with this Agreement." *Id.* § 11(c). The Terms of Service do not contemplate that DoorDash will share with restaurants the type of data the Ordinance would force DoorDash to disclose, and the Terms expressly limit restaurants' use of any such customer data to only what is "necessary" to fulfill orders—not to directly market to customers or otherwise compete with DoorDash.

28. DoorDash limits the customer data it shares with restaurants for two principal reasons. First, DoorDash respects consumer privacy and honors the commitment to minimal data

---

[3] A small number of restaurant partners negotiate custom terms with DoorDash related to customer data, all of which provide protections for customer privacy that go beyond the standard Terms of Service.

sharing expressed in its Privacy Policy. DoorDash knows that many customers do not want to give their full name, telephone number, email address, and physical address to every restaurant that fulfills an order. There are many reasons to want to minimize the number of entities who possess such data, ranging from physical safety to safeguarding financial accounts to avoiding unwanted marketing. Customers who use third-party platforms: (1) do not expect their sensitive personal data to be shared with restaurants (and in fact do not share this data when eating in or picking up from a restaurant); and (2) are not placing an order directly through the restaurant, in which case customers would have a reasonable expectation that the restaurant from which they are directly ordering will receive the data they provide.

29. Second, the data that the Ordinance would require DoorDash to disclose constitutes DoorDash's trade secrets. Every factor that the Second Circuit considers in determining whether something is a trade secret favors a finding of a trade secret here. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009). Specifically:

a. The customer data at issue derives independent economic value from being kept secret. By keeping this data private, DoorDash is able to offer (and earn revenue from) powerful, proprietary marketing tools that depend on the data.

b. The data is generally not known outside of DoorDash's business. The main exception is where DoorDash shares customer data with service providers who help facilitate its services. In those circumstances, DoorDash has a process to review the security procedures that such vendors maintain to safeguard customer data, and DoorDash requires that service providers implement reasonable security measures to protect such information. For example, support vendors must use email- or hardware-based multi-factor authentication and are also restricted based on IP address to approved working locations. Also, service providers generally cannot use the information for purposes other than to provide their services to DoorDash.

c. DoorDash invests heavily in privacy and cybersecurity and takes significant measures to protect its customer data, including data that would be subject to compelled disclosure under the Ordinance. DoorDash employs a variety of means of protecting personal information, from layered technical controls to organizational policies and processes. In addition, DoorDash continually impresses upon its personnel that the protection of personal information is a critical responsibility of everyone at DoorDash. The measures taken by DoorDash to safeguard personal information and the systems that process it include multi-factor authentication, administrative and logical access controls, network segmentation, encryption, vulnerability and penetration testing, and threat detection and prevention tools. DoorDash also implements access controls and organizational policies to help protect access to individual information. All of these mechanisms provide a layered approach to safeguarding DoorDash's network environments, systems, and data.

d. DoorDash also implements a variety of controls to ensure that its employees preserve the confidentiality of DoorDash's customer data. For example, DoorDash performs access reviews to regularly assess which employees have access to what DoorDash tools and data. In addition, employees sign confidentiality agreements and agree to corporate privacy policies that govern their access to DoorDash data. DoorDash also runs a data loss prevention program, which enables DoorDash to determine if, for example, employees are exporting data via email or other processes.

e. DoorDash uses this data in its business, which allows DoorDash to obtain an advantage over competitors who do not possess the same data. For example, the data allows DoorDash to understand consumer trends regarding the types of food they order and from what types of restaurants, as well as the popularity of particular geographic areas and delivery addresses. This data allows DoorDash

to better serve customers, and provide relevant offerings that appeal to consumers based on their geographic location and order preferences (e.g., displaying favorite items in a region), among other things. It also enables DoorDash to ensure it appropriately calibrates supply and demand, and thus offers sufficient services to busy geographic markets and restaurants. The data helps DoorDash provide customers with relevant offerings—and is why restaurants often opt for reaching customers through DoorDash's platforms.

f. DoorDash has expended considerable effort and money in obtaining this customer data. DoorDash spends tens of millions of dollars each year in advertising and research to build its customer base and develop enhanced features to attract customers to the DoorDash platform, which in turn generates billions of dollars each year in revenue for local restaurants. Investing to increase and retain customers in turn means acquiring the customer data and insights that the Ordinance would require DoorDash to provide to restaurants free of charge.

g. Restaurants (and other third parties) cannot easily acquire or duplicate this data. If they could, there would be no need for an Ordinance that compels DoorDash to disclose its customer data to restaurants.

## C. DoorDash Aids New York City Restaurants During The COVID-19 Pandemic

30. COVID-19 is a novel virus that began spreading across the United States in early 2020. In March 2020, both Mayor Bill de Blasio and then-Governor Andrew Cuomo declared states of emergency that, in conjunction with guidance from the New York State Department of Economic Development, curtailed or eliminated on-premises dining at restaurants, among other measures.

31. During the COVID-19 pandemic, many New York City customers relied on third-party platforms to facilitate delivery of food to their homes. Similarly, many New York City

restaurants relied on platforms to facilitate the sale and delivery of their food. Accordingly, during the COVID-19 pandemic, restaurant demand for use of DoorDash's platform generally increased.

32.    The COVID-19 pandemic also caused many of DoorDash's costs to increase. For example, to ensure that delivery couriers could remain active and earning, DoorDash provided free personal protective equipment and highly subsidized on-demand healthcare to couriers, and provided financial assistance to couriers who tested positive for COVID-19 and those in certain other high-risk categories.

33.    Despite increased demand for DoorDash's platform and, in many cases, increased costs to meet that demand, DoorDash in many instances undertook a series of costly actions to support restaurants. For example, between March 2020 and May 2020, DoorDash relief programs saved restaurants more than $120 million. DoorDash undertook significant measures to protect and support customers and couriers, and also made significant investments to support local restaurants. For example, DoorDash provided a 30-day commission-free trial to about 9,000 restaurants in New York City that chose to join its platform during the pandemic. DoorDash voluntarily reduced commissions for existing restaurants by half from April 9, 2020 to May 31, 2020. DoorDash further invested millions of dollars to reduce or eliminate customer fees and to generate more orders for restaurants, which helped restaurants keep their doors open for delivery. And DoorDash built a new product to enable every independent restaurant or franchise to receive daily payouts to ease cash flow concerns. DoorDash additionally granted $500,000 to help New York City restaurants make preparations for a winter of outdoor dining, with 100 restaurants receiving $5,000 each, in partnership with the New York Hospitality Alliance. For many restaurants, these measures were key to keeping their doors open during the pandemic, paying bills, and retaining and hiring additional staff.

D.    **The City Enacts The Ordinance**

34.    On or about May 12, 2021, Council Member Keith Powers introduced a bill that would become the Ordinance.

35.     The bill regulated the relationship between "third-party food delivery services" and "food service establishments," the definitions of which have stayed constant over time and apply equally to the Ordinance.  "Third-party food delivery services" (which this Complaint refers to as "third-party platforms" for simplicity and accuracy) are defined as "any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 food service establishments located in the city that are owned and operated by different persons."  *See* N.Y.C. Admin. Code § 20-845.  "Food service establishments" (which this Complaint refers to as "restaurants") are defined as "a place where food is provided for individual portion service directly to the consumer whether such food is provided free of charge or sold, and whether consumption occurs on or off the premises or is provided from a pushcart, stand or vehicle."  N.Y.C. Health Code § 81.03(s).

36.     As originally introduced, the bill required third-party platforms to share "all customer data applicable to an online order with the [restaurant] fulfilling such order," and prohibited third-party platforms from limiting restaurants' ability "to download and retain such data" or to "use . . . such data for marketing or other purposes."  NYC Int. No. 2311 § 2 (May 12, 2021), attached hereto as Ex. 4.  "Customer data" was defined as the customer's name, telephone number, email address, delivery address, and the contents of the order.  *Id.* § 1.  The bill did not require restaurants to request the data, did not place any requirements or limitations on how restaurants must store or use the data, and did not provide customers with any notice or an opportunity to consent to their data being disclosed by third-party platforms to restaurants.

37.     The bill would not apply to any other businesses with which restaurants transact, such as point-of-sale service providers, online reservation platforms, or advertising companies.

38.     The Committee on Consumer Affairs and Business Licensing (the "Committee") issued a report through the Governmental Affairs Division making clear that the bill had been proposed to economically advantage restaurants at the expense of DoorDash and other third-party platforms.  The Committee report acknowledged that customer data is valuable data that third-

party platforms use "to enhance their own services," and recognized that third-party platforms "assert ownership" of customer data that is acquired through "their [own] products." Ex. 6 at 10, 12 (June 8 Committee Report).  By requiring third-party platforms to hand over customer data when a consumer placed an order, the bill would allow restaurants to conduct "marketing outreach like offering promo codes . . . or special discounts."  *Id.* at 11.  Forcing third-party platforms to turn over customer data, in short, would help "drive future profits for restaurant owners."  *Id.* at 10–11.

39.     The Committee held a hearing and received written testimony on the bill on June 8, 2021.  Special interest groups openly favored the bill as a way to transfer revenue from third-party platforms to restaurants.

      a.  A New York State Restaurant Association representative, for example, testified that restaurants benefit from "takeout and delivery orders" fulfilled by third-party platforms to keep "cash-flow coming" in.  Ex. 7 at 8 (June 8 written testimony).  Despite this beneficial relationship, the restaurant association supported the bill because it would allow restaurants "to reach out directly to their customers" to, among other things, "offer a promotion."  *Id.*  By forcing third-party platforms to transfer data to restaurants, the bill would allow restaurants to compete directly with third-party platforms, "level[ ] the playing field," and stop the purported "gate keeping by third party platforms."  *Id.* at 9.

      b.  Similarly, a representative of the New York City Hospitality Alliance testified that restaurants were "at the mercy of mega-sized delivery companies," and transferring data from third-party platforms to restaurants would enable restaurants to "directly . . . offer [customers] deals, market to them, and more."  *Id.* at 12.

40.     In contrast, Tech:NYC and the Electronic Frontier Foundation—organizations committed to technology and privacy issues—"strongly oppose[d]" the bill as "ultimately a net negative."  Ex. 7 at 44–45.  They explained that the bill rested "on the faulty premise that it will

'level the playing field' for small businesses": third-party platforms and restaurants were already "working together every day to find new ways to promote growth in local stores . . . without the dangerous data sharing mandate contemplated" by the bill. *Id.* at 44. Further, they noted that the data required to be disclosed by the bill "is not the type of personal information merchants would require during their normal course of business." *Id.* A person who dines in at a restaurant does not provide their name, telephone number, email, and address to complete that order. *Id.* On the other hand, that data is needed "solely to perform food purchasing transactions and delivery" services—which is why it makes sense for third-party platforms, but not restaurants, to collect that data. *Id.* Requiring the disclosure of customers' personal data to restaurants would also carry trickle-down consequences. The bill "simply assumes that restaurants have the technical capacity" to securely store the data, even though "not all restaurants will have the resources to invest in a secure operating system" to keep the data secure, which would create a significant risk of a "security breach." *Id.* at 44–45. And the bill's "[f]orced dissemination of personal information" would "no doubt lead to unsolicited calls and text messages, email spam, and junk mail." *Id.* at 45.

41. Third-party platforms also raised concerns about consumer privacy and the consequences of giving restaurants data about customers that restaurants have not historically collected.

  a. A DoorDash representative explained that DoorDash was "committed to empowering our restaurant partners to reach new customers and drive sales." Ex. 7 at 19. He identified the "various products" and "tools" DoorDash offers to "restaurants that want to interact directly with customers and still make use of" delivery services, such as DoorDash Storefront and Drive, and explained that these services "allow[ ] customers to decide who they share their information with." *Id.* at 20. But he also noted that the bill "endanger[ed] consumer privacy" in a manner that "other jurisdictions have previously considered and rejected." *Id.* at 19–20. Most troubling, he explained, was the

bill's lack of "any effective safeguards in place to ensure that restaurants are protecting [customers'] sensitive data." *Id.* at 20. While DoorDash has invested substantial amounts of money into developing necessary systems and policies to protect user privacy, "many restaurants are not able to invest in the resources necessary to keep data secure from modern threats." *Id*.

b. A Grubhub representative also raised concerns about the data-sharing required by the bill. Customers who use third-party platforms "do not expect their information to be shared with" restaurants—not only because customers do not place an order through the restaurant, but also because the data required to be shared under the bill "is not [data] traditionally collected by restaurants in the analog world." *Id.* at 21. The bill would also entitle restaurants to the data "even if the establishment does not have adequate security processes in place to protect that data," thereby "undercut[ting] the privacy rights of New York City consumers." *Id.* Moreover, the bill "would undoubtedly lead to a proliferation of unsolicited and unwanted spam from merchants," including "unsolicited calls and text messages, email spam, and junk mail." *Id.*

c. An Uber Eats representative expressed similar concerns about data privacy, noting that third-party platforms have developed "data security and privacy program[s]" because they are "subject to strict laws" at the international, national, and state levels. *Id.* at 24. But laws do not impose similar requirements on restaurants, meaning that "restaurants that receive this data would not be subject to any such data protection requirements." *Id.* The Uber Eats representative offered a simple, alternative solution: restaurants could include "direct marketing in the bags being delivered to their consumers," which would allow restaurants and consumers to connect "directly"—and thus enable customers to "choose to do [what] they wish" with respect to particular restaurants—without "compromis[ing]" their personal data. *Id.*

42. Council Members supporting the bill, however, brushed aside these concerns in the name of economic favoritism. At a June 8 hearing, the Ordinance's chief sponsor, Council Member Powers, stated that his bill's "intention" was to create "balance and equity between" third-party platforms and restaurants. Ex. 8 at 20:6–10 (June 8 Committee hearing transcript); *see also id.* at 54:23–24 (Council Member Reynoso stating that "we should be" "look[ing] out for the restaurants" when considering laws governing the relationship between third-party platforms and restaurants). After recognizing that third-party platforms are "intermediar[ies]" that "retain and . . . hold" their customers' data, Council Member Powers bluntly asserted that restaurants "should be able to use that data when it comes to marketing" their own business—i.e., cutting out the intermediary that spent time, energy, and resources to collect the data in the first place. *Id.* at 19:25–20:15.

43. New York City lawmakers do not view the Ordinance's disclosure requirements as limited to COVID-19 emergency relief. In voting against the Ordinance, Council Member Kalman Yeger explained that the bill "has nothing to do with COVID-19," Ex. 9 at 14:16–16:9, and criticized the majority for "hiding under COVID as a reason for data to transmit from one party to another," Ex. 10 at 45:19–20 (July 29 Council meeting transcript). Those who voted in favor of the bill did not suggest Council Member Yeger was incorrect. Council Member Powers stated that the Ordinance is intended to allow "restaurants and local businesses" a "better opportunity to compete" with third-party platforms long-term. Ex. 8 at 20:20–25. Similarly, special interest groups that supported the Ordinance do not pretend that it is tied in any way to the COVID-19 pandemic. For example, New York State Restaurant Association Government Affairs Coordinator Kathleen Reilly testified in support of the Ordinance without mentioning the pandemic or public health at all. Rather, she asked the City Council to "change" the "dynamic" between restaurants and third-party platforms. *Id.* at 94–95.

44. But under the existing dynamic, third-party platforms *support* small businesses. In almost all cases, a restaurant's overall revenue increases when it joins DoorDash's platform and/or one of its competitors. This held especially true during COVID-19, where restaurants were able

to increase revenues due to their partnership with DoorDash. A committee report on the Ordinance acknowledged this reality: third-party platforms "were a crucial lifeline to New York City's restaurants" "throughout the pandemic." Ex. 11 at 3–4 (July 29 Committee Report). Indeed, the odds of surviving the COVID-19 pandemic were eight times higher for restaurants that partnered with DoorDash than those that did not. The marketing tools that DoorDash provided to restaurants allowed millions of New Yorkers to view the offerings of local restaurants from the palm of their hand, even as they did not see other types of marketing such as street signs or other public displays. The fees that restaurants pay in exchange for the marketing services they select from DoorDash fund the costs of operating DoorDash's platform, which ultimately are for restaurants' benefit. During the COVID-19 pandemic, DoorDash also transitioned to a three-tier pricing system for Marketplace delivery services, where restaurants could choose one of three Partnership Plans (Basic, Plus, or Premium) at different price points depending on the products and services that best suit their needs. These offerings help restaurants by providing them several options from which to choose.

45.     Nonetheless, Council Member Powers cited the recent "hard year" for restaurants during the COVID-19 pandemic as a purported justification to compel disclosure of this personally sensitive and commercially valuable customer data. Ex. 8 at 20:20–21; *see also* Ex. 9 at 9:15–22 ("[W]e've had to think creatively in the past year by how to support our restaurants" that were "hit hard . . . by the COVID-19 pandemic").

46.     On July 29, 2021, the Committee proposed an amended bill—eventually adopted as the Ordinance—that carried forward the original proposals' core requirements. Under the amended bill, third-party platforms would be forced to disclose customer data—including the customer's name, telephone number, email address, delivery address, and contents of the order— to restaurants fulfilling an order. NYC Int. 2311-A § 1 (July 29, 2021), attached hereto as Ex. 5; *see also* Ex. 10 at 21. Further, third-party platforms are prohibited from limiting restaurants' ability to "download and retain such data" and from limiting "their use of such data for marketing

or other purposes." NYC Int. 2311-A § 1(c). Non-compliance would subject third-party platforms to a civil penalty of $500 per day per restaurant. *See* Ex. 10 at 21.

47. The amended bill also includes three new requirements. First, it requires restaurants to "request customer data." NYC Int. 2311-A § 1(a). Second, it provides that all third-party platform customers "shall be presumed to have consented to the sharing of" customer data for "all online orders." *Id.* § 1(b). To override that presumption, a customer must make a "request [not to share data] in relation to a specific online order"—meaning that customers have to make order-by-order decisions to opt out of sharing. *Id.* Third, the amended bill prohibits restaurants from "sell[ing], rent[ing], or disclos[ing]" customer data they received from third-party platforms "to any other party in exchange for financial benefit" without the customer's consent. *Id.* § 1(d). But the amended bill otherwise placed no restrictions on restaurants' use of the data. For example, restaurants could share the data with any third party so long as they don't receive a financial benefit in exchange. They could even aggregate it with other restaurants to create a competing delivery platform. Moreover, the amended bill provides no requirements regarding how restaurants would have to store or maintain data in a manner that is secure from modern-day threats. Nothing on the face of the Ordinance suggests any link to COVID-19, emergency measures, or state-mandated restaurant capacity restrictions.

48. A Committee report accompanying the amended bill again underscored the bill's intent to enrich a small group of restaurants at the expense of third-party platforms. The report acknowledged that third-party platforms were "a crucial lifeline to New York City's restaurants" and that restaurants "mutual[ly] benefit[ted]" from "online ordering and delivery." Ex. 11 at 4–5. But the Committee felt it had to do "all [it] can" to "assist the restaurant industry." *Id.* at 3. Noting that third-party platforms had earned "hefty rewards" from New York City residents ordering food through their platforms, *id.* at 4, the Committee sought to redistribute those revenues to the "food and restaurant industry," *id.* at 2, by breaking up third-party platforms' purported "monopoliz[ation]" of data about their own customers, *id.* at 9.

49.     The Committee approved the as-amended Ordinance on July 29, 2021. Council Member Powers, describing himself as "the son of a former restaurant owner," explained that his bill was "part of an effort . . . to really help our restaurant industry" and "support our restaurants and bars." Ex. 9 at 9:15–23, 11:10–11. Council Member Diana Ayala applauded the Committee for "find[ing] creative ways to support the [restaurant] industry" and found it "difficult to believe that the food delivery apps are actually concerned about consumer data privacy," *id.* at 5:4, 7:9–11—even though independent organizations dedicated to privacy issues had raised the same concerns in opposing the bill, *see supra* ¶ 40, and even though *other* Committee members who eventually supported the Ordinance expressed "concerns" about "data privacy," Ex. 9 at 12:22–13:1 (Council Member Lander); *see also id.* at 13:19–14:4 (Council Member Menchaca explaining concerns about "the privacy pieces" of the Ordinance before deciding those issues could be punted to a potential "follow-up bill").

50.     Council Member Yeger, however, criticized the Committee for "creatively stretch[ing] the relationship between the pandemic and" the Ordinance because "[t]his [bill] has nothing to do with COVID-19." Ex. 9 at 14:22–15:3. On the merits, Council Member Yeger explained that the Ordinance set up what is "in essence a contract of adhesion" by "forcing" the disclosure of customers' private data to restaurants "that may not have the kind of secure platforms that the app companies have." *Id.* at 15:5–16:5. Council Member Yeger further criticized the bill's opt-out provision as ineffectual, "ask[ing] everybody . . . how many people read through the opt-out questions before they just, [say] no, . . . let's keep going, let's just get my order in." *Id.* at 15:19–22. Because restaurants could keep the data "in perpetuity," the bill was "removing the choice [of sharing data with restaurants] from consumers" and thus was an "anti-consumer bill." *Id.* at 15:15–16:9. Council Member Yeger stated that the "fix for" any purported imbalance of data between restaurants and third-party platforms "is very simple": "If restaurants want to keep the information . . . that they're not getting because the apps took the order, put a menu in the bag saying for a 10% coupon sign up to our mailing list," and let customers decide whether they want to take restaurants up on that offer by sharing data directly with restaurants. *Id.* at 15:9–13.

51.     Also on July 29, 2021, the City Council approved the Ordinance, with 35 members voting in favor, 8 abstaining or absent, and 6 voting no.  Speaker Corey Johnson explained that the Ordinance's purpose was to play economic favoritism by "creat[ing] an equitable playing field between [third-party] platforms and the restaurants."  Ex. 10 at 19:5–7.  And despite explicitly acknowledging that he "do[es]n't like the app industry," Council Member Yeger again explained that the Ordinance "weaponize[ed] . . . the pandemic for purposes of attacking an industry that we don't like," and that he could not support "hiding under COVID as a reason for data to transmit from one party to another."  *Id.* at 45:12–20.

52.     The City Council passed the Ordinance without any research or analysis appropriate for such legislation.  Upon information and belief, the City Council did not conduct (or ask anyone else to conduct) research or analysis regarding the potential effects of the Ordinance on customers, restaurants, delivery couriers, third-party platforms, or the local economy.  Moreover, upon information and belief, the City Council did not conduct (or ask anyone else to conduct) research or analysis regarding whether disclosure of less data would be appropriate, or why the disclosure of such extensive data—customers' full names, email addresses, phone numbers, and delivery addresses (which predominantly equates to disclosing customers' home addresses)—was necessary.  Upon information and belief, the City Council also did not conduct (or ask anyone else to conduct) research or analysis regarding whether such extensive data disclosure to parties not equipped to safeguard it would compromise the financial and physical safety of DoorDash customers, particularly those from New York's more vulnerable communities.  And, upon information and belief, the City Council did not conduct (or ask anyone else to conduct) research or analysis regarding differences between third-party platforms that serve 20 or more restaurants and third-party platforms that serve fewer than 20 restaurants that would justify requiring large platforms to disclose customer data but exempt smaller platforms from any such disclosure requirement.

53.     Upon information and belief, no court, agency, or legislature has found DoorDash's failure to disclose sensitive consumer data to restaurants to be deceptive, misleading, or otherwise unlawful.

54.     On August 29, 2021, the Ordinance became law when Mayor de Blasio returned the bill unsigned.  *See* Local Law No. 2021/090 (Aug. 29, 2021).  The Ordinance will take effect on December 27, 2021.

**E.     The Ordinance Is Part Of The Council's Pattern Of Favoring Restaurants Over Third-Party Platforms Under The Pretext Of The COVID-19 Pandemic**

55.     The Ordinance was just the latest attempt by the Council to economically advantage restaurants at the expense of third-party platforms under the guise of the COVID-19 pandemic. The City Council's cap on the fees that third-party platforms such as DoorDash may charge restaurants, and its repeated extension of that fee cap, similarly revealed the City Council's animus toward third-party platforms.

56.     In May 2020, Mayor de Blasio signed Int. No. 1908-B into law, which created N.Y.C. Admin. Code §§ 20-845–20-848 (the "Fee Cap").  The Fee Cap made it "unlawful for a third-party food delivery service to charge a food service establishment a delivery fee that totals more than 15% of the purchase price of each online order," as well as "unlawful for a third-party food delivery service to charge a food service establishment any fee other than a delivery fee for the use of their service greater than 5% of the purchase price of each online order," with the exception of pass-through credit card fees.  N.Y.C. Admin. Code § 20-846(a), (b).  The Fee Cap originally was scheduled to expire 90 days after the ***ban on on-premises dining*** was lifted.

57.     But—as with the Ordinance—City Council members made clear that the COVID-19 pandemic was a pretext for imposing price-fixing regulations that they wanted to impose regardless of any ongoing public-health emergency.  *See, e.g.*, Francisco Moya, Twitter.com (Apr. 14, 2020), https://bit.ly/3CBqsaA ("NYC local restaurants needed a 10% cap on delivery fees from third party services like GrubHub long before #COVID19 hit us.  They damn sure need it now."); New York City Council, *Council Votes to Provide Relief to Small Businesses and Restaurants*

*Impacted by COVID-19 Pandemic* (May 13, 2020), https://on.nyc.gov/37sNySA (Council Member Moya stating that the "relationship" between "[m]om and pop restaurants across New York City" and "billion-dollar tech companies . . . isn't unique to the pandemic").

58.     In August 2020, the City Council moved the goalposts for the first time by extending the Fee Cap until 90 days after ***full-capacity indoor dining*** resumed in restaurants.  *See* NYC Int. No. 2054-A, attached hereto as Ex. 12.  On May 19, 2021, Governor Cuomo ended capacity restrictions on restaurants, which were permitted to resume 100% capacity indoor dining. Because all capacity restrictions were lifted on May 19, 2021, the Fee Cap was set to expire on August 17, 2021.

59.     Nonetheless, on July 29, 2021 (the same day the Ordinance was passed), the City Council moved the goalposts a second time by extending the Fee Cap until an arbitrarily selected date of ***February 17, 2022***.  *See* NYC Int. No. 2359-A, attached hereto as Ex. 13.  The newly extended Fee Cap omits any reference to a state of emergency or accompanying state-mandated capacity restrictions due to COVID-19.

60.     On August 26, 2021, the City Council moved the goalposts a third time when it passed Int. No. 2390, which will make the Fee Cap ***permanent***, regardless of capacity restrictions due to COVID-19.  *See* NYC Int. No. 2390, attached hereto as Ex. 14.  Those bills will become law on September 25, 2021, unless Mayor de Blasio vetoes them.[4]

61.     Accordingly, the Fee Cap is of a piece with the Ordinance—namely, a law enacted under the pretext of a global pandemic that is in fact designed to economically favor restaurants over third-party platforms.

**F.     The Ordinance Targets And Irreparably Harms DoorDash, And Will Likely Harm Restaurants, Customers, And Delivery Couriers**

62.     DoorDash's contracts with restaurants, including the various advertising, marketing, and analytical tools it offers, have benefited restaurants before, during, and after the

---

[4]     DoorDash and other plaintiffs have challenged the Fee Cap in a separate lawsuit.  *See DoorDash, Inc. et al. v. City of New York*, No. 21-cv-7564 (S.D.N.Y. filed Sept. 9, 2021).

COVID-19 pandemic by enlarging their customer base to include (i) customers who never would have known about or chosen the restaurant but for DoorDash's marketing efforts, (ii) those customers who otherwise would have eaten at the restaurant in person but could not do so under shelter-in-place orders, and (iii) customers who would not have eaten at the restaurant in person but purchase food for delivery or takeout.

63.     The Ordinance will likely constrain the services that DoorDash can offer going forward.  In order to offset the lost marketing revenue and lost customer base as a result of the Ordinance, DoorDash could be forced to increase the fees it charges consumers who place delivery orders, or reduce the scope of the services provided to restaurants and consumers alike.  Due to the City Council's Fee Cap, DoorDash cannot offset its losses by raising restaurant commissions— so customers will be forced to bear the brunt of DoorDash's modified business model.  If DoorDash modifies its operations in New York City, then DoorDash, many local restaurants, and delivery couriers would be irreparably harmed.

64.     Indeed, the Ordinance will likely have the perverse result of harming the businesses that it purportedly intends to help.  DoorDash's experience with the Fee Cap during the pandemic has borne this out—platforms facilitated fewer orders than they otherwise would have because of increased consumer-facing costs in certain jurisdictions.  Additional decreases in Dasher earnings and tax revenue are likely to occur as a result of the Ordinance.

65.     Moreover, the Ordinance will irreparably harm DoorDash.  The repeated compelled disclosures constitute a repeated violation of DoorDash's constitutional rights—clear irreparable harm.  *See Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003) ("[V]iolations of First Amendment rights are presumed to be irreparable.").  DoorDash will also suffer irreparable harm due to the Ordinance's deleterious effect on DoorDash's reputation, goodwill, and business model.  For example:

  a.  The Ordinance's requirement that DoorDash share its trade secrets with restaurants on at least a monthly basis would allow restaurants to compete

directly with DoorDash by free-riding on data that DoorDash has spent tens of millions of dollars to acquire (and keep confidential).

b. The Ordinance will also likely reduce DoorDash's customer base, because restaurants will be able to use DoorDash's customer data to market directly to consumers who use DoorDash and solicit those consumers to cut DoorDash out of the equation.

c. Because restaurants receive DoorDash's proprietary customer data for free, restaurants will have less incentive to partner with or advertise through DoorDash. And DoorDash cannot recoup lost revenues from restaurants because the City's Fee Cap prevents DoorDash from charging merchants the fee they agreed to pay. Instead, the Ordinance will likely require DoorDash to try to recoup some of its lost revenue from consumers, harming DoorDash's reputation and goodwill in the City.

d. The Ordinance will also likely require DoorDash to scale back certain marketing and promotional services in the City.

e. The Ordinance will also likely require DoorDash to terminate contracts with existing restaurant partners, and/or decline to enter into new contracts with prospective restaurant partners.

f. The Ordinance will also likely tarnish DoorDash's goodwill with its customers, who will inevitably blame DoorDash for disclosing their data to restaurants and for any adverse effects that result from restaurants having their sensitive information.

# FIRST CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the First Amendment of the United States Constitution (42 U.S.C. § 1983); Declaratory Relief and Injunctive Relief, for Violation of Article I, Section 8 of the New York Constitution (Compelled Speech))**

66.     DoorDash realleges and incorporates herein by reference Paragraphs 1 through 65 above.

67.     The Ordinance violates the First Amendment of the United States Constitution, which protects both the freedom *to* speak and the freedom *not* to speak.  The Ordinance compels DoorDash to speak a particular message that it otherwise would not speak—DoorDash has never communicated to restaurants all of the data required by the Ordinance, and it would not do so absent the Ordinance.  As such, strict scrutiny applies, and the Ordinance is "'presumptively unconstitutional.'" *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*") (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)).

68.     The City cannot establish that the Ordinance furthers a compelling government interest.  The Ordinance does not (and does not purport to) cure any alleged consumer deception.  Likewise, it does not (and does not purport to) cure any alleged deception of restaurants.  Rather, the City Council has made clear that the Ordinance's purpose is to make it easier for restaurants to market directly to customers, avoid paying marketing fees to DoorDash, and gain a competitive advantage.  That is not a legitimate, let alone compelling, government interest.

69.     The City cannot establish that the Ordinance is narrowly tailored to achieve any compelling government interest.  Even if there were such an interest in restaurants receiving data sufficient for them to contact customers directly (there is not), a law that requires disclosure of customers' full names, email addresses, telephone numbers, delivery addresses, and order contents is a far cry from narrowly tailored.  Nor is a law that presumes that every customer consents to the disclosure of such data narrowly tailored.

70.     The speech compelled by the Ordinance is not "commercial speech" because it does not involve speech that advertises or proposes a transaction to consumers.  *See Bad Frog Brewery,*

*Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 97 (2d Cir. 1998) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)). But the Ordinance violates the First Amendment even if the Court considered the relevant speech to be commercial speech subject to the Supreme Court's test in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 637 (1985). *Zauderer* requires compelled commercial speech to (1) "reasonably relate[] to the State's interest in preventing deception of consumers," *id.* at 651, (2) not be "unduly burdensome," *id.*, and (3) be justified by a "substantial governmental interest," *id.* at 638; *see also NIFLA*, 138 S. Ct. at 2377 (under *Zauderer*, compelled disclosure mandates must remedy a harm that is "not purely hypothetical" and may extend "no broader than reasonably necessary") (quotation marks and citations omitted). The Ordinance does not relate to consumer deception in any way. Requiring DoorDash to disclose its trade secrets to restaurants on a monthly basis (for no compensation) so that restaurants can use those trade secrets to compete with DoorDash is unduly burdensome. And there is no legitimate, let alone substantial, government interest in compelling the disclosure of these trade secrets.[5]

71.     For substantially similar reasons, the Ordinance violates Article I, Section 8 of the New York Constitution.

72.     The City, as a municipality, may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (establishing that municipal liability under Section 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights).

73.     In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

74.     The City's unconstitutional conduct proximately caused DoorDash's injury.

---

[5]     DoorDash's causes of action under the First Amendment, Contract Clause, Dormant Commerce Clause, Equal Protection Clause, Due Process Clause, and police power do not depend on the Court finding the relevant data to be DoorDash's trade secret. The Court should award all the relief sought herein regardless of whether it agrees that this data formally constitutes a trade secret.

75.    A bona fide and actual controversy exists between DoorDash and the City in that DoorDash alleges, and the City denies, that the enactment of the Ordinance violated the First Amendment of the United States Constitution and Article I, Section 8 of the New York Constitution.

76.    DoorDash desires a judicial determination of the validity of the Ordinance to save itself from the harm caused by the enactment of the Ordinance, which deprives DoorDash of the benefit of its longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to DoorDash.

77.    A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal constitutional rights that results from applying the Ordinance to DoorDash.

78.    In light of the violation of the First Amendment of the United States Constitution and Article I, Section 8 of the New York Constitution, DoorDash further seeks preliminary and permanent injunctive relief against enforcement of the Ordinance.  The ongoing violation of DoorDash's constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on DoorDash's reputation, goodwill, and business model.

79.    In light of the violation of the First Amendment of the United States Constitution, DoorDash further seeks monetary damages.

## SECOND CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Contract Clause of the United States Constitution (42 U.S.C. § 1983))**

80.    DoorDash realleges and incorporates herein by reference Paragraphs 1 through 79 above.

81.    The Ordinance violates Article I, Section 10 of the United States Constitution, which prohibits state and local governments from "pass[ing] any . . . Law impairing the Obligation of Contracts."  The Contract Clause "limits . . . the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power."  *See Allied Structure*

*Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978). This is because "[c]ontracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Id.* at 245.

82. The Ordinance operates as a substantial impairment of DoorDash's contractual relationships with restaurants, many of which DoorDash entered into long ago. Those contracts included fixed-percentage commissions in exchange for delivery, valuable marketing and other services. Both parties reasonably relied on these contractual provisions, and both parties planned their expenditures accordingly. Such reliance on the marketing provisions was vital to the contracting parties. Had DoorDash known that it would be required to disclose the customer data contemplated by the Ordinance to restaurants, it would have structured its restaurant-facing contracts much differently. When DoorDash entered into restaurant-facing contracts, there was no indication that the City would compel the disclosure of this customer data, and no reasonable contracting party would have contemplated such compelled disclosure.

83. The Ordinance also operates as a substantial impairment of DoorDash's contractual relationships with customers. DoorDash has entered into contractual relationships with customers through its Terms & Conditions and Privacy Policy, which explain to customers that DoorDash will disclose only customers' first name, last initial, and order contents to restaurants. Compliance with the Ordinance necessarily would require DoorDash to disclose more information than customers expect.

84. The Ordinance is intended to favor one subset of the public—a subset of restaurant owners—rather than the public at large. The reality is that restaurants and the public will likely be harmed if third-party platforms modify their operations in New York City, or if those platforms seek additional revenue from customers to counteract the permanent decrease in marketing revenue as a result of the Ordinance.

85. The Ordinance does not advance a significant or legitimate public purpose. It does not further the public health or safety. It does not respond to an ongoing public-health threat. And

far from promoting the general welfare, it engages in ill-conceived economic protectionism that is counterproductive to achieving its stated, illegitimate purpose.

86.     The adjustment of the rights and responsibilities of the contracting parties is not based upon reasonable conditions and of a character appropriate to the public purpose justifying the legislation's adoption.  It is not reasonable to compel the disclosure of DoorDash's trade secrets—especially when the express purpose of such interference is economic protectionism of one party at the other's expense.  The Ordinance has undermined the benefit of the bargain for third-party platforms, like DoorDash, interfered with the parties' reasonable expectations, and prevented third-party platforms like DoorDash from safeguarding their rights.

87.     The unreasonableness of the interference is underscored by the City's recent budget surplus and the availability of other lawful methods to aid restaurants.

88.     The City, as a municipality, may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

89.     In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

90.     The City's unconstitutional conduct proximately caused DoorDash's injury.

91.     A bona fide and actual controversy exists between DoorDash and the City in that DoorDash alleges, and the City denies, that the enactment of the Ordinance violated the Contract Clause of the United States Constitution.

92.     DoorDash desires a judicial determination of the validity of the Ordinance to save itself from the harm caused by the enactment of the Ordinance, which deprives DoorDash of the benefit of its longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to DoorDash.

93.     A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal constitutional rights that results from applying the Ordinance to DoorDash.

94.     In light of the violation of the Contract Clause of the United States Constitution, DoorDash further seeks preliminary and permanent injunctive relief against enforcement of the Ordinance.  The ongoing violation of DoorDash's constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on DoorDash's reputation, goodwill, and business model.

95.     In light of the violation of the Contract Clause of the United States Constitution, DoorDash further seeks monetary damages.

## THIRD CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Takings Clause of the Fifth Amendment to the United States Constitution (42 U.S.C. § 1983); Declaratory and Injunctive Relief for Violation of Article I, Section 7 of the New York Constitution (Takings))**

96.     DoorDash realleges and incorporates herein by reference Paragraphs 1 through 95 above.

97.     The federal and state Constitutions prohibit the government from taking private property "without just compensation."  U.S. Const. amend. V; N.Y. Const. art. I, § 7.  Contracts and trade secrets constitute property within the meaning of the Fifth Amendment and are susceptible to a "taking" within the meaning of the Takings Clause.  *See Lynch v. United States*, 292 U.S. 571, 579 (1934); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984).  Thus, the City may not deprive DoorDash of the benefits of its contractual and trade secret property rights without prior and just compensation.

98.     The customer data that the Ordinance would force DoorDash to disclose constitutes DoorDash's trade secret, which is a protected property right under the Takings Clause.

99.     By forcing DoorDash to disclose that trade secret to restaurants, the Ordinance eliminates DoorDash's central property right in the trade secret—the right to exclusive use.  And the right to exclusive use is the reason the trade secret has economic value.  By depriving DoorDash of the economic value of its property right, the Ordinance effects a *per se* or categorical taking of DoorDash's property.  It does not provide any compensation to DoorDash for that taking.

100. In addition, the Ordinance interferes with DoorDash's investment-backed expectations, undermines DoorDash's ability to make economic use of its property, and is unfair and unreasonable. DoorDash spent millions of dollars to develop and maintain as confidential its customer data, and neither the law nor private contracts required DoorDash to disclose that data to third parties. DoorDash thus invested in customer data and relied on it to generate revenue, primarily through marketing tools. By compelling the disclosure of customer data and allowing restaurants to free-ride off of DoorDash's efforts in acquiring that data, the Ordinance will cause restaurants to pay far fewer or even no marketing commissions going forward. The Ordinance thus substantially diminishes the economic value of DoorDash's contracts and prevents and will continue to prevent DoorDash from obtaining reasonable returns on its investments.

101. The taking of DoorDash's property is not for any valid public purpose and the Ordinance does not substantially advance a closely and legitimately connected government interest. The Ordinance is expressly designed to take DoorDash's trade secrets and give them to restaurants. Moreover, the Ordinance goes too far in its economic effect on DoorDash, and the economic injuries caused by the Ordinance should be compensated by the government rather than remain disproportionately borne by DoorDash without just compensation. The City has interfered with DoorDash's legitimate and reasonable investment-backed expectations in its contracts with restaurants to such a degree that the Ordinance is the functional equivalent of government appropriation without just compensation.

102. The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

103. In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

104. The City's unconstitutional conduct proximately caused DoorDash's injury.

105. A bona fide and actual controversy exists between DoorDash and the City in that DoorDash alleges, and the City denies, that the enactment of the Ordinance violated Article I,

Section 7 of the New York Constitution and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

106. DoorDash desires a judicial determination of the validity of the Ordinance to save itself from the harm caused by the enactment of the Ordinance, which deprives DoorDash of the benefit of its longstanding contracts with restaurants. The enactment of the Ordinance results in substantial hardship to DoorDash.

107. A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Ordinance to DoorDash.

108. In light of the violation of Article I, Section 7 of the New York Constitution and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution, DoorDash further seeks preliminary and permanent injunctive relief against enforcement of the Ordinance. The ongoing violation of DoorDash's constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on DoorDash's reputation, goodwill, and business model.

109. In light of the violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution, DoorDash further seeks monetary damages.

<u>**FOURTH CAUSE OF ACTION**</u>

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Dormant Commerce Clause of the United States Constitution (42 U.S.C. § 1983))**

110. DoorDash realleges and incorporates herein by reference Paragraphs 1 through 109 above.

111. The Ordinance discriminates against interstate commerce on its face.

112. The Ordinance has the purpose and effect of discriminating against, and imposing a substantial burden on, interstate commerce.

113. DoorDash is incorporated and headquartered outside of New York, yet it falls within the Ordinance's definition of "third-party food delivery service," *i.e.*, "any website, mobile

application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 food service establishments located in the city that are owned and operated by different persons." N.Y.C. Admin. Code § 20-845.

114. Smaller local third-party platforms serving 20 or fewer restaurants are not forced to disclose customer data. Thus, the Ordinance creates a discriminatory market, enabling local services to gain a larger share of the total sales in the market than that of larger out-of-state service providers that comprise the entire, or nearly entire, class of entities subject to the Ordinance's regulation. The Ordinance is a "straightforward attempt[] to discriminate in favor of local" business prohibited by the Dormant Commerce Clause doctrine. *Granholm v. Heald*, 544 U.S. 460, 489 (2005).

115. Not only does the Ordinance affirmatively facially discriminate against out-of-state actors in this industry by shifting the costs of regulation on them, thus favoring local interests—which is a per se violation of the Dormant Commerce Clause—it also places a burden on interstate commerce that clearly outweighs the minimal, if any, local benefits conveyed by the Ordinance. *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003).

116. The City had "other means to advance" its "local interest," *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994), but chose not to use those other nondiscriminatory means, which could have included workable alternatives such as a loan program, tax breaks, or other economic interventions.

117. The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

118. In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

119. The City's unconstitutional conduct proximately caused DoorDash's injury.

120.	A bona fide and actual controversy exists between DoorDash and the City in that DoorDash alleges, and the City denies, that the enactment of the Ordinance violates the Dormant Commerce Clause of the United States Constitution.

121.	DoorDash desires a judicial determination of the validity of the Ordinance to save itself from the harm caused by the enactment of the Ordinance, which deprives DoorDash of the benefit of its longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to DoorDash.

122.	A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal constitutional rights that results from applying the Ordinance to DoorDash.

123.	In light of the violation of the Dormant Commerce Clause of the United States Constitution, DoorDash further seeks preliminary and permanent injunctive relief against enforcement of the Ordinance.  The ongoing violation of DoorDash's constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on DoorDash's reputation, goodwill, and business model.

124.	In light of the violation of the Dormant Commerce Clause of the United States Constitution, DoorDash further seeks monetary damages.

## FIFTH CAUSE OF ACTION

**(Declaratory and Injunctive Relief for Violation of Article IX, Section 2(c) of the New York Constitution, New York Municipal Home Rule Law Section 10(ii)(a)(12), and New York General City Law Section 20(13) (Police Power))**

125.	DoorDash realleges and incorporates herein by reference Paragraphs 1 through 124 above.

126.	Contained within the New York Constitution and state statutes are limitations on the City's right to exercise police power, *i.e.*, to enact laws for the safety, health, well-being, and welfare of its residents.  A City exceeds its police power where an ordinance "bears no relation to the welfare of the public generally," including when it is "designed for the convenience and interest of a special class."  *People v. Greenman*, 137 N.Y.S.2d 388, 389 (1952).

127.    The Ordinance exceeds the City's police power because it does not promote the public health, safety, or general welfare.  It does not seek to benefit all New York City workers or businesses.  Instead, the Ordinance aims to advance the narrow interests of restaurants at the expense of customers who may be adversely affected by higher fees, and couriers who may lose out on delivery opportunities, and third-party platforms who will lose a key aspect of their value proposition to restaurants.

128.    The Ordinance's disclosure requirement cannot be justified as a response to the COVID-19 (or any other) emergency.  Nor is there any other ongoing emergency that would justify this compelled disclosure.

129.    Upon information and belief, the City has not conducted (or asked anyone else to conduct) research or analysis regarding (i) the Ordinance's potential effect on customers, restaurants, third-party platforms, or the local economy, (ii) any reason why this particular data should be disclosed, or (iii) any differences third-party platforms that serve 20 or more restaurants and third-party platforms the serve fewer than 20 restaurants that would justify treating the two types of platforms differently.

130.    The Ordinance does not require any other third party that contracts with restaurants to disclose customer data (or any other sensitive data that would give restaurants a competitive advantage).  Rather, it compels speech only of certain large third-party platforms.

131.    A bona fide and actual controversy exists between DoorDash and the City in that DoorDash alleges, and the City denies, that the enactment of the Ordinance violated Article IX, Section 2(c) of the New York Constitution and related statutes setting the limits of municipal police power.

132.    DoorDash desires a judicial determination of the validity of the Ordinance to save itself from the harm caused by the enactment of the Ordinance, which deprives DoorDash of the benefit of its longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to DoorDash.

133.     A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of state constitutional and statutory rights that results from applying the Ordinance to DoorDash.

134.     In light of the violation of Article IX, Section 2(c) of the New York Constitution, DoorDash further seeks preliminary and permanent injunctive relief against enforcement of the Ordinance.  The ongoing violation of DoorDash's constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on DoorDash's reputation, goodwill, and business model.

## SIXTH CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Due Process Clause of the United States Constitution (42 U.S.C. § 1983); Declaratory and Injunctive Relief for Violation of Article I, Section 6 of the New York Constitution (Due Process))**

135.     DoorDash realleges and incorporates herein by reference Paragraphs 1 through 134 above.

136.     The Ordinance violates the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution and the Due Process Clause of Article I, Section 6 of the New York Constitution because it imposes an irrational and arbitrary disclosure requirement on certain third-party platforms and provides preferential economic treatment to local restaurants at the direct expense of third-party platforms.

137.     Businesses have a constitutionally protected interest in operating free from unreasonable governmental interference, and are also protected from excessive and unreasonable government conduct intentionally directed toward them.  The Ordinance lacks a reasonable and nondiscriminatory legislative purpose.  It has no (let alone a substantial) relation to the public health, safety, or general welfare.  Favoring a specific industry at the expense of another is not a legitimate legislative purpose.

138.     There is no rational basis for compelling disclosure of trade secrets or similarly sensitive commercial data without adequately compensating third-party platforms.

139.    Both the content and context of the Ordinance demonstrates that it is confiscatory in nature and intended to harm third-party platforms, essentially forcing them to subsidize certain restaurants' profit margins by handing over valuable trade secrets.  The City's animus toward third-party platforms is further underscored by its Fee Cap that prohibits platforms from charging reasonable and competitive fees for their services, or from recouping the losses imposed by the Ordinance.

140.    The unreasonable interference with DoorDash's business that the Ordinance imposes, coupled with the negative effects on the restaurant industry and customers that may result from the Ordinance, demonstrates that the Ordinance is arbitrary and irrational, without any conceivable rational basis, and was enacted in violation of due process.

141.    The City may be held liable for this violation under the United States Constitution 42 U.S.C. § 1983.

142.    In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

143.    The City's unconstitutional conduct proximately caused DoorDash's injury.

144.    A bona fide and actual controversy exists between DoorDash and the City in that DoorDash alleges, and the City denies, that the enactment of the Ordinance violated Article I, Section 6 of the New York Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

145.    DoorDash desires a judicial determination of the validity of the Ordinance to save itself from the harm caused by the enactment of the Ordinance, which deprives DoorDash of the benefit of its longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to DoorDash.

146.    A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Ordinance to DoorDash.

147.     In light of the violation of Article I, Section 6 of the New York Constitution and the Fourteenth Amendment to the United States Constitution, DoorDash further seeks preliminary and permanent injunctive relief against enforcement of the Ordinance.  The ongoing violation of DoorDash's constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on DoorDash's reputation, goodwill, and business model.

148.     In light of the violation of the Fourteenth Amendment to the United States Constitution, DoorDash further seeks monetary damages.

### SEVENTH CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Equal Protection Clause of the United States Constitution (42 U.S.C. § 1983); Declaratory and Injunctive Relief for Violation of Article I, Section 11 of the New York Constitution (Equal Protection))**

149.     DoorDash realleges and incorporates herein by reference Paragraphs 1 through 148 above.

150.     The Ordinance violates the Equal Protection Clause of the Fourteenth Amendment, which requires that the reason for treating two groups differently be rationally related to a legitimate government interest.

151.     The Ordinance imposes an irrational and arbitrary burden on DoorDash and certain third-party platforms by forcing them to disclose commercially valuable trade secrets and providing preferential economic treatment to certain restaurants at the direct expense of third-party platforms, which is not a reasonable and nondiscriminatory legislative purpose.  The Ordinance does not require any other third party with which restaurants contract—for example, online reservation platforms—to disclose comparably sensitive, confidential data.  The City's animus toward third-party platforms (as further evidenced by the Fee Cap) was a significant motivation of this differential treatment.

152.     The Ordinance is irrational and arbitrary for another reason:  it caps the fees of third-party platforms that serve "no fewer than 20 food service establishments located in the city that are owned and operated by different persons," but not those that serve fewer than 20 such

establishments.  N.Y.C. Admin. Code § 20-845.  The City has not provided any (let alone a rational) basis for this distinction.  Small third-party platforms would be exempted from the Ordinance's disclosure requirement.  The Ordinance seems specifically intended to carve out such groups and provide them with a competitive advantage to the detriment of larger businesses like DoorDash.

153.    The Ordinance will undermine the City's own supposed purpose of assisting restaurants because it will drive up customer costs, drive down deliveries, and thus negatively impact customers, couriers, and restaurants.

154.    For substantially the same reasons, the Ordinance violates Article I, Section 11 of the New York Constitution.

155.    The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

156.    In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

157.    The City's unconstitutional conduct proximately caused DoorDash's injury.

158.    A bona fide and actual controversy exists between DoorDash and the City in that DoorDash alleges, and the City denies, that the enactment of the Ordinance violated the Equal Protection Clauses of the United States and New York Constitutions.

159.    DoorDash desires a judicial determination of the validity of the Ordinance to save itself from the harm caused by the enactment of the Ordinance, which deprives DoorDash of the benefit of its longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to DoorDash.

160.    A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Ordinance to DoorDash.

161.    In light of the violation of Equal Protection Clauses of the United States and New York Constitutions, DoorDash further seeks preliminary and permanent injunctive relief against

enforcement of the Ordinance. The ongoing violation of DoorDash's constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on DoorDash's reputation, goodwill, and business model.

162.     In light of the violation of the Fourteenth Amendment to the United States Constitution, DoorDash further seeks monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, DoorDash respectfully requests that this Court enter judgment in DoorDash's favor and grant the following relief:

1.     A declaration that the Ordinance violates provisions of the United States Constitution and the New York Constitution;

2.     Just compensation, according to proof, for taking of property;

3.     An award of damages against the City according to proof;

4.     A preliminary and permanent injunction enjoining the City from enforcing the Ordinance against DoorDash;

5.     An award of fees, costs, expenses, and disbursements, including attorneys' fees to which DoorDash is entitled pursuant to 42 U.S.C. § 1988 and other applicable law; and

6.     Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, DoorDash demands a trial by jury in this action of all issues so triable.

Dated:    New York, New York
           September 15, 2021

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Anne Champion*
    Anne Champion
    200 Park Avenue, 47th Floor
    New York, NY  10166-0193
    Telephone:  (212) 351-4000
    AChampion@gibsondunn.com

    Joshua S. Lipshutz (*pro hac vice forthcoming*)
    1050 Connecticut Ave. NW
    Washington, DC  20036-5306
    Telephone:  (202) 955-8500
    JLipshutz@gibsondunn.com

    *Attorneys for Plaintiff DoorDash, Inc.*