UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x
                            :

DOORDASH, INC.,                    :

            Plaintiff,       :  No.  **21-cv-7695**

      -against-            :

CITY OF NEW YORK,        :

            Defendant.     :

                            :
--------------------------------------------------------x

---

### PLAINTIFF DOORDASH, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

GIBSON, DUNN & CRUTCHER LLP
Anne Champion
200 Park Avenue, 47th Floor
New York, NY 10166-0193
Telephone: (212) 351-4000
AChampion@gibsondunn.com

Joshua S. Lipshutz (*pro hac vice forthcoming*)
1050 Connecticut Ave. NW
Washington, DC 20036-5306
Telephone: (202) 955-8500
JLipshutz@gibsondunn.com

*Attorneys for Plaintiff DoorDash, Inc.*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 4

I.     DoorDash Offers Valuable Marketing And Other Services To Restaurants In
Exchange For A Commission.......................................................................... 4

II.    New York City Enacts An Ordinance Forcing DoorDash To Disclose
Confidential Customer Data. .......................................................................... 5

III.   The Ordinance Is Expressly Intended To Advantage Restaurants At The
Expense Of DoorDash, Other Third-Party Platforms, And Consumer Privacy. .......... 6

LEGAL STANDARD........................................................................................... 9

ARGUMENT .................................................................................................... 9

I.     DoorDash Is Likely To Succeed On The Merits. ............................................... 10

     A.    DoorDash Is Likely To Succeed On Its Compelled Speech Claim.................. 10

          1.    Because the Ordinance is a content-based regulation of
protected speech, strict scrutiny applies. ............................................ 11

          2.    The Ordinance fails strict-scrutiny review because it serves no
compelling interest and is not narrowly tailored in any event. ........... 14

          3.    Commercial speech standards of review do not apply because
the compelled communications here are non-commercial
speech. ............................................................................................. 16

          4.    In any event, the Ordinance also fails under *Zauderer* review............ 18

     B.    DoorDash Is Likely To Succeed On Its Takings Clause Claim. ..................... 19

          1.    DoorDash's customer data is protected property under the
Takings Clause. ................................................................................ 20

          2.    The Ordinance is a taking.................................................................. 24

               a)     The Ordinance is a categorical or "per se" taking. .......... 25

               b)     The Ordinance is a non-categorical taking. ..................... 26

     C.    DoorDash Is Likely To Succeed On Its Contract Clause Claim. .................... 28

**TABLE OF CONTENTS** *(continued)*

<u>Page</u>

D.      DoorDash Is Likely To Succeed On Its Police Power Claim..........................32

II.      DoorDash Will Suffer Irreparable Harm Absent A Preliminary Injunction. ..............33

III.      The Public Interest And Balance Of Equities Support An Injunction. .......................35

IV.      DoorDash Should Not Be Required To Post A Bond. .................................................37

CONCLUSION......................................................................................................................37

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*725 Eatery Corp. v. City of New York*,
408 F. Supp. 3d 424 (S.D.N.Y. 2019).........................................................................9, 35, 37

*A.H. v. French*,
985 F.3d 165 (2d Cir. 2021).........................................................................................3, 36

*Abdul Wali v. Coughlin*,
754 F.2d 1015 (2d Cir. 1985)...........................................................................................34

*Agudath Israel of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020)..........................................................................................3, 34

*Airbnb, Inc. v. City of N.Y.*,
373 F. Supp. 3d 467 (S.D.N.Y. 2019).............................................................................34

*Albany Area Builders Ass'n v. Town of Guilderland*,
141 A.D.2d 293 (N.Y. App. Div. 1988) ...........................................................................32

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978)..................................................................................................29, 31

*Ashland Mgmt. Inc. v. Janien*,
624 N.E.2d 1007 (N.Y. 1993)...........................................................................................21

*Association of Equipment Manufacturers v. Burgum*,
932 F.3d 727 (8th Cir. 2019) .....................................................................................30, 31

*Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*,
134 F.3d 87 (2d Cir. 1998)...............................................................................................17

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983)....................................................................................................16, 17

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011).........................................................................................................14

*Burns v. Martuscello*,
890 F.3d 77 (2d Cir. 2018)...............................................................................................10

*Calder v. Bull*,
3 U.S. 386 (1798)..................................................................................................2, 20, 28

**TABLE OF AUTHORITIES**
(continued)

Page

*Cedar Point Nursery v. Hassid*,
    141 S. Ct. 2063 (2021)......................................................................................20, 25

*Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.*,
    447 U.S. 557 (1980)...............................................................................................16

*Churchill Comm'cns Corp. v. Demyanovich*,
    668 F. Supp. 207 (S.D.N.Y. 1987)........................................................................22

*Cienega Gardens v. United States*,
    331 F.3d 1319 (Fed. Cir. 2003).............................................................................28

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010).......................................................................................9

*CompassCare v. Cuomo*,
    465 F. Supp. 3d 122 (N.D.N.Y. 2020)..............................................................2, 11

*Conn. Bar Ass'n v. United States*,
    620 F.3d 81 (2d Cir. 2010).....................................................................................17

*Covino v. Patrissi*,
    967 F.2d 73 (2d Cir. 1992).....................................................................................33

*Cuyahoga River Power Co. v. City of Akron*,
    240 U.S. 462 (1916)...............................................................................................29

*DDS, Inc. v. Lucas Aerospace Power Transmission Corp.*,
    182 F.R.D. 1 (N.D.N.Y. 1998)..............................................................................24

*Doctor's Associates, Inc. v. Distajo*,
    107 F.3d 126 (2d Cir. 1997)...................................................................................37

*DoorDash, Inc. et al. v. City of New York*,
    No. 21-cv-7564 (S.D.N.Y. filed Sept. 9, 2021) ......................................................7

*E. Enters. v. Apfel*,
    524 U.S. 498 (1998)...............................................................................................27

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983).........................................................................................29, 31

*Expressions Hair Design v. Schneiderman*,
    137 S. Ct. 1144 (2017)...........................................................................................13

# TABLE OF AUTHORITIES
(continued)

Page

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)................................................................21, 22

*FCC v. Fla. Power Corp.*,
    480 U.S. 245 (1987)................................................................................26

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
    730 F.2d 61 (2d Cir. 1984)........................................................20, 22, 26

*Good Humor Corp. v. City of New York*,
    49 N.E.2d 153 (N.Y. 1943)......................................................................32

*Hernandez Aguilar v. Decker*,
    482 F. Supp. 3d 139 (S.D.N.Y. 2020).................................................35, 36

*Hirschfeld v. Stone*,
    193 F.R.D. 175 (S.D.N.Y. 2000) ............................................................34

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995)..........................................................................13, 18

*IMDb.com Inc. v. Becerra*,
    962 F.3d 1111 (9th Cir. 2020) .............................................................12, 14

*IMS Health Inc. v. Sorrell*,
    630 F.3d 263 (2d Cir. 2010)....................................................................13

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996)..................................................................9, 34

*Kelo v. City of London*,
    545 U.S. 469 (2005)........................................................................2, 20, 28

*Leo Silfen, Inc. v. Cream*,
    278 N.E.2d 636 (N.Y. 1972)....................................................................24

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)................................................................................25

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)................................................................................25

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992)..............................................................................26

**TABLE OF AUTHORITIES**
(continued)

Page

*Lynch v. City of New York,*
589 F.3d 94 (2d Cir. 2009).................................................................................34

*Marquez v. Annucci,*
2020 WL 3871362 (S.D.N.Y. July 9, 2020) ......................................................36

*McCullen v. Coakley,*
134 S. Ct. 2518 (2014) .......................................................................................12

*Mitchell v. Cuomo,*
748 F.2d 804 (2d Cir. 1984)...............................................................................36

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992) ...........................................................................................35

*People ex rel. Moskowitz v. Jenkins,*
94 N.E. 1065 (N.Y. 1911)..................................................................................33

*Mullins v. City of N.Y.,*
626 F.3d 47 (2d Cir. 2010).................................................................................33

*N. Atl. Instruments, Inc. v. Haber,*
188 F.3d 38 (2d Cir. 1999)...............................................................20, 22, 23, 24

*N.Y. Progress & Protection PAC v. Walsh,*
733 F.3d 483 (2d Cir. 2013)...............................................................................36

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health,*
556 F.3d 114 (2d Cir. 2009)...............................................................................17

*Nat'l Elec. Mfrs. Ass'n v. Sorrell,*
272 F.3d 104 (2d Cir. 2001)...............................................................................17

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
138 S. Ct. 2361 (2018)............................................................2, 11, 16, 18, 19

*Nu-Chem Labs., Inc. v. Dynamic Labs., Inc.,*
2001 WL 35981560 (E.D.N.Y. Mar. 30, 2001).................................................21

*Otto v. City of Boca Raton,*
981 F.3d 854 (11th Cir. 2020) ...........................................................................12

*Penn Central Transportation Co. v. New York City,*
438 U.S. 104 (1978)...........................................................................................26

**TABLE OF AUTHORITIES**
(continued)

Page

*Pension Fund Guar. Corp. v. R.A. Gray & Co.*,
467 U.S. 717 (1984) ................................................................................................28

*People v. Cohen*,
5 N.E.2d 835 (N.Y. 1936) ...................................................................................3, 33

*Philip Morris, Inc. v. Reilly*,
312 F.3d 24 (1st Cir. 2002) ..............................................................................25, 26

*Philliben v. Uber Techs., Inc.*,
2016 WL 9185000 (N.D. Cal. Apr. 15, 2016) .......................................................21

*PSEG Long Island LLC v. Town of N. Hempstead*,
158 F. Supp. 3d 149 (E.D.N.Y. 2016) ...............................................................2, 17

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ................................................................................................11

*Register.com, Inc. v. Verio Inc.*,
356 F.3d 393 (2d Cir. 2004) ...................................................................................34

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
487 U.S. 781 (1988) ...........................................................................10, 11, 13, 16

*Roman Catholic Diocese of Brooklyn, N.Y. v. Cuomo*,
141 S. Ct. 63 (2020) ...............................................................................................34

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) .........................................................................2, 20, 25, 26, 27

*Safelite Grp., Inc. v. Jepsen*,
764 F.3d 258 (2d Cir. 2014) ...................................................................................18

*Satellite Television of N.Y. Assocs. v. Finneran*,
579 F. Supp. 1546 (S.D.N.Y. 1984) .......................................................................35

*Shamrock Power Sales, LLC v. Scherer*,
2015 WL 5730339 (S.D.N.Y. Sept. 30, 2015) .......................................................23

*Sherman v. Town of Chester*,
752 F.3d 554 (2d Cir. 2014) .......................................................................24, 26, 27

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ..........................................................................................13, 14

**TABLE OF AUTHORITIES**
(continued)

Page

*Sveen v. Melin*,
　　138 S. Ct. 1815 (2018) ...................................................................3, 28, 29

*Vermont Railway, Inc. v. Town of Shelburne*,
　　918 F.3d 82 (2d Cir. 2019) ..............................................................32

*W. Watersheds Project v. Michael*,
　　869 F.3d 1189 (10th Cir. 2017) ........................................................13

*Washington Post v. McManus*,
　　944 F.3d 506 (4th Cir. 2019) ............................................................12

*Wisconsin v. Yoder*,
　　406 U.S. 205 (1972) ....................................................................14, 15

*Wooley v. Maynard*,
　　430 U.S. 705 (1977) ......................................................................10

*Yang v. Kosinski*,
　　960 F.3d 119 (2d Cir. 2020) ............................................................35

*Zauderer v. Office of Disciplinary Counsel*,
　　471 U.S. 626 (1985) ...............................................................16, 17, 18

**Other Authorities**

Albert Cahn & Dana Levy, *Surveillance and The City: NYC's Delivery Data
Dilemma*, Gotham Gazette (July 16, 2021), https://bit.ly/2Y2n2hj ......................36

Cindy Rubi Estrada, *New York City Hispanic Chamber of Commerce Letter to
Protect Consumers and Businesses*, Harlem World Mag. (July 27, 2021),
https://bit.ly/3yw7f6U ...................................................................8

Matt Tracy, *Council Passes Restaurant Data Sharing Bill Opposed By GMHC,
NGLCC*, GayCityNews (July 29, 2011), https://bit.ly/3jrDXCd ......................8, 37

**Rules**

Fed. R. Civ. P. 65(c) ...................................................................37

**Regulations**

N.Y.C. Admin. Code § 20-845 .............................................................5, 6

N.Y.C. Admin. Code § 20-846 ............................................................3, 31

## TABLE OF AUTHORITIES
(continued)

Page

N.Y.C. Admin. Code § 20-847.3 ........................................................................5, 6

N.Y.C. Admin. Code § 20-848(a)........................................................................6

**Constitutional Provisions**

N.Y. Const. art. I, § 8........................................................................10

N.Y. Const. art. I, § 7........................................................................19

N.Y. Const. art. IX, § 2(c)(1)........................................................................32

U.S. Const. amend. I........................................................................10

U.S. Const. amend. V........................................................................19

U.S. Const. art. I, § 10........................................................................28

## PRELIMINARY STATEMENT

This case challenges the constitutionality and legality of N.Y.C. Int. No. 2311-A, an unprecedented New York City Ordinance that compels third-party food ordering and delivery platforms like Plaintiff DoorDash, Inc. ("DoorDash") to divulge their customers' sensitive personal information—including their name, telephone number, delivery address, email address, and order contents—to the restaurants that use the platforms.  This compelled disclosure is a shocking intrusion of consumers' privacy at a time of increasingly heightened concern about identity theft and cyber-security threats.  Consumers would not expect to divulge this kind of personal information when they dine-in at restaurants, but the Ordinance presumes that consumers want to share this same information when they order through a third-party platform.  Making matters worse, the Ordinance simply assumes that all restaurants have the capacity and resources to securely store the disclosed customer data.  As privacy advocates and community groups warned in objecting to the Ordinance, these forced disclosures put consumers, including vulnerable populations, at risk of data breaches and unwanted information-sharing.

The City has made clear why it placed consumers' privacy at risk:  to "drive future profits for restaurant owners" by allowing them to free-ride on third-party platforms' confidential, commercially valuable data.  The City's efforts amount to an unconstitutional compulsion of speech, an unlawful taking of DoorDash's sensitive business information, an unconstitutional impairment of private parties' contractual bargains, and a naked attempt to competitively disadvantage DoorDash and other third-party platforms by driving a stake through their business models.  If allowed to take effect on December 27, 2021 as planned, the Ordinance will immediately and irreparably upend the relationship between DoorDash, restaurants, and customers.  To avoid that end, this Court should preliminarily enjoin the Ordinance.

DoorDash is likely to prevail on the merits of its claims because the Ordinance violates DoorDash's constitutional rights in a multitude of ways.

*First*, the Ordinance compels DoorDash to communicate its customer data in violation of the First Amendment and New York State Constitution.  As a "content-based regulation" of non-commercial speech, the Ordinance is "presumptively unconstitutional," and "may be justified only if the government proves [it is] narrowly tailored to serve [a] compelling state interest[]."  *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*").  No such compelling interest is served here, where the Ordinance is an admitted attempt to economically advantage restaurants at third-party platforms' expense, and is not narrowly tailored toward that end in any event.  The Ordinance is thus likely to fail strict scrutiny review.  *See*, *e.g.*, *CompassCare v. Cuomo*, 465 F. Supp. 3d 122, 140 (N.D.N.Y. 2020) (citing *NIFLA* in applying strict scrutiny and preliminarily enjoining law compelling disclosure of "factual and accurate information" that defendants "otherwise would not" disclose); *PSEG Long Island LLC v. Town of N. Hempstead*, 158 F. Supp. 3d 149, 168 (E.D.N.Y. 2016) (similar).

*Second*, the Ordinance violates the Takings Clause.  DoorDash's customer data is valuable trade secret property, and protected under the Takings Clause.  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04 (1984).  By forcing DoorDash to disclose that data without compensation, the Ordinance has extinguished the core property right of a trade secret—the right of exclusive use—and thus constitutes a *per se* taking.  Moreover, the Ordinance is a transparent attempt to take property from third-party platforms and give it to restaurants, an egregious form of regulatory taking that the Supreme Court has disapproved for over two centuries.  *See Kelo v. City of London*, 545 U.S. 469, 477 (2005); *Calder v. Bull*, 3 U.S. 386, 388 (1798) (Chase, J.).  Worse, DoorDash cannot even attempt to recoup the value of these trade secrets from restaurants because the City

has also unconstitutionally capped the fees DoorDash can negotiate with restaurants.  *See* N.Y.C. Admin. Code § 20-846 (the "Fee Cap").

*Third*, the Ordinance violates the Contract Clause.  DoorDash has formed thousands of contractual relationships with New York City restaurants on the understanding that DoorDash would *not* share competitively sensitive customer data in those relationships.  The Ordinance upends these freely negotiated contracts for the improper purpose of financially benefitting a particular economic actor.  The Contract Clause does not tolerate this kind of interference with private parties' choices to order their business affairs in a particular manner.  *See Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018).

*Fourth*, the Ordinance exceeds New York City's police power, which allows the City to enact laws to protect the health, safety, and well-being of the public.  A law requiring the transfer of customer data from one private party to another does nothing to make people healthier or safer.  And the Ordinance is unlawful because it is designed to benefit not the public well-being but rather "the convenience and interest of a special class"—restaurants.  *People v. Cohen*, 5 N.E.2d 835, 835 (N.Y. 1936).

Enjoining the Ordinance before it takes effect on December 27, 2021 will avert the irreparable harm associated with these constitutional violations, and would be in the public interest.  As the Second Circuit has repeatedly held, both factors support a preliminary injunction when a plaintiff shows a likely constitutional violation, and the Court need go no further.  *A.H. v. French*, 985 F.3d 165, 184 (2d Cir. 2021); *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020).  In any event, additional harms and public-interest considerations are evident.  DoorDash would be forced to divulge confidential information whose value, once disclosed, cannot be restored.  These disclosures in turn will harm New York City consumers, whose privacy rights will

be trampled.  And there is no countervailing interest in allowing the City to immediately enforce an unconstitutional and harmful Ordinance.

This Court should thus issue a preliminary injunction enjoining the Ordinance's enforcement, pending resolution of this suit.

## STATEMENT OF FACTS

**I.     DoorDash Offers Valuable Marketing And Other Services To Restaurants In Exchange For A Commission.**

DoorDash is a technology company that operates a third-party platform connecting restaurants with consumers throughout New York City and beyond.  Kaplan Decl. ¶¶ 5–6.[1]  This is a mutually beneficial relationship: Restaurants that partner with DoorDash increase their marketing exposure, customer base, and revenue, while New York City customers enjoy the convenience of thousands of local menus at their fingertips.  Kaplan Decl. ¶¶ 6–9.

Consumers that use DoorDash agree that DoorDash may collect certain "profile data" needed to complete transactions, such as the customer's "name, email address, delivery address, and phone number."  Ex. 2 § 1(a) (DoorDash Privacy Policy).  Over the years, DoorDash has spent tens of millions of dollars on marketing to promote and improve its business, and in doing so, generate a robust customer base.  Kaplan Decl. ¶ 21.  And DoorDash has invested in a variety of safeguards to protect the secrecy of its customer data.  Kaplan Decl. ¶¶ 22–23.  The reason is simple:  protecting the privacy of customer data is important to DoorDash, and DoorDash's customer data is a valuable component of DoorDash's business model, allowing it to better serve restaurants and customers alike through powerful proprietary marketing tools and a variety of other services.  Kaplan Decl. ¶¶ 17–20.  That data also contains sensitive personal identifying

---

[1]     References to "Kaplan Decl." are to the declaration of Marissa Kaplan submitted in support of the instant motion. References to "Ex." are to the exhibits to the Declaration of Anne Champion, dated September 14, 2021 and filed herewith.

information that DoorDash's customers have entrusted the company with safekeeping, pursuant to its Terms and Conditions.  Kaplan Decl. ¶ 17.

When a consumer in New York City places a takeout or to-go order from a restaurant through DoorDash's platform, DoorDash is careful not to disclose any more customer data to restaurants than necessary to complete the transaction.  Kaplan Decl. ¶¶ 13, 17.  Specifically, DoorDash's practice is to share only a customer's first name, last initial, and order contents—but not their telephone number, delivery address, email address, or full last name, absent the customer opting in to such sharing.  Kaplan Decl. ¶ 13; *see* Ex. 2 §§ 1(a), 4(b).  And restaurants agree not to use customer data to directly market to customers or otherwise compete with DoorDash, though they remain free to place marketing materials directly into customers' delivery or to-go orders. Kaplan Decl. ¶ 15; *see* Ex. 3 §§ 1(c), 1(w), 11(c) (DoorDash merchant Terms of Service).

## II.   New York City Enacts An Ordinance Forcing DoorDash To Disclose Confidential Customer Data.

On July 29, 2021, the New York City Council voted to pass the Ordinance, Ex. 5, and on August 29, 2021, the Ordinance became law.  *See* L.L. 2021/090 (adding N.Y.C. Admin. Code § 20-847.3).  The Ordinance will take effect on December 27, 2021.  *See id.*

At the heart of the Ordinance is its mandatory data-disclosure requirement, which states that "third-party food delivery service[s]" like DoorDash "shall provide" to restaurants, upon "request," "all applicable customer data."  N.Y.C. Admin. Code § 20-847.3(a).[2]  The customer data that must be disclosed is the data that DoorDash has invested millions of dollars acquiring in the course of attracting users to its platform to help local restaurants, including the customer's

---

2   A "third-party food delivery service" is defined elsewhere in the New York City Administrative Code as "any website, mobile application or other Internet service that offers or arranges for" the sale and same-day delivery or pickup of food and beverages.  N.Y.C. Admin Code § 20-845.  However, delivery services that serve "fewer than 20 [restaurants] located in the city" are *not* subject to the Ordinance.  *Id.*

(1) name, (2) telephone number, (3) delivery address, (4) email address, and (5) the contents of the online order.  L.L. 2021/092 (Aug. 29, 2021) (amending N.Y.C. Admin. Code § 20-845).

In an affront to consumer privacy, the Ordinance "presume[s]" that customers "have consented to the sharing of such customer data applicable to all online orders."  N.Y.C. Admin. Code § 20-847.3(b).  Although individual customers may opt out, they must do so for each "specific online order"—meaning that customers must continually and repeatedly opt out on an order-by-order basis, or else their private data will be disclosed.  *Id.*

Under the Ordinance, DoorDash must provide customer data to restaurants "on at least a monthly basis," and DoorDash is prohibited from imposing *any* "limit" on how restaurants "download," "retain," or "use" that data "for marketing or other purposes."  N.Y.C. Admin. Code § 20-847.3(c).  Although restaurants are instructed not to sell or disclose for financial benefit the customer data without consent, *id.* § 20-847.3(d), the Ordinance imposes no other conditions or requirements on how restaurants collect, store, secure, maintain, or use the data.

The penalties for non-compliance by third-party platforms are severe: $500 "per violation," with violations accruing "on a daily basis for each day and each [restaurant]."  N.Y. Admin. Code § 20-848(a).

### III.    The Ordinance Is Expressly Intended To Advantage Restaurants At The Expense Of DoorDash, Other Third-Party Platforms, And Consumer Privacy.

Throughout the legislative process, the Ordinance's supporters were open about their intentions in passing this unprecedented bill:  Allow restaurants to free-ride on the confidential, commercially valuable customer data of DoorDash (and other third-party platforms) so that restaurants could profit and DoorDash's business model could be thwarted.  *See* Ex. 6 at 11 (June 8 Committee Report); Ex. 11 at 2–4, 9 (July 29 Committee Report).

6

As one of the bill's sponsors explained, the Ordinance is designed to allow "restaurants and local businesses" a "better opportunity to compete" long-term with third-party platforms by sabotaging those platforms' proprietary, hard-won, and closely guarded data.  Ex. 8 at 20:25–25 (June 8 Committee hearing transcript).  The Ordinance pursues this goal by breaking up third-party platforms' purported "monopoliz[ation]" of *their own customers' data*, Ex. 11 at 9, and forcing third-party platforms to hand over that valuable customer data to restaurants on demand.  By forcing the disclosure of DoorDash's confidential, proprietary data collection, the Ordinance would allow restaurants to conduct "marketing outreach like offering promo codes . . . or special discounts" to DoorDash's customers—*i.e.*, to take those customers away from DoorDash.  Ex. 6 at 11.

As cover for this blatant and "creative[]" transfer of valuable information, the Ordinance's sponsors cited the "hard year" for restaurants during the COVID-19 pandemic—even as a Committee report acknowledged that third-party platforms like DoorDash had proven to be "a crucial lifeline to New York City's restaurants" during the pandemic.  Ex. 9 at 9:15–22 (July 29 Committee hearing transcript); Ex. 8 at 20:20–21; Ex. 11 at 3–4; *see also* Kaplan Decl. ¶¶ 26–28.[3]

The Ordinance was sharply criticized by a host of third parties who raised concerns about its privacy implications for consumers.  As the Electronic Frontier Foundation and Tech:NYC explained in written testimony, the Ordinance is "a net negative" for consumers.  Ex. 7 at 44–45 (June 8 written testimony).  The Ordinance's "dangerous data sharing mandate" "simply assumes

---

[3]    The Ordinance is part of a Council pattern of favoring the restaurant industry over third-party platforms.  In 2020, the Council passed a Fee Cap that prohibited third-party food delivery services like DoorDash from charging (1) delivery fees totaling more than 15% of the purchase price of each online order and (2) *any* fee other than a delivery fee that is greater than 5% of the purchase price of each online order, with an exception for pass-through credit card fees.  Int. No. 1908-B (creating N.Y.C. Admin. Code §§ 20-845–20-848).  Although the Fee Cap was scheduled to expire 90 days after a New York City on-premises dining ban was lifted, the Council twice extended it and then made it permanent, and the new Fee Cap omits any reference to COVID-19 restrictions.  *See* Exs. 12, 13, 14 (NYC Int. Nos. 2054-A, 2359-A, 2390).  DoorDash and other plaintiffs have challenged the Fee Cap in a separate lawsuit.  *See DoorDash, Inc. et al. v. City of New York*, No. 21-cv-7564 (S.D.N.Y. filed Sept. 9, 2021).

that restaurants have the technical capacity" to securely store the data, even though "not all restaurants will have the resources to invest in a secure operating system," such that customers' data will be at significant risk of a "security breach." *Id.* at 44–45. And the Ordinance's "[f]orced dissemination of personal information" would "no doubt lead to unsolicited calls and text messages, email spam, and junk mail." *Id.* at 45.

The Ordinance's "lack of data security and [the] amount of data being shared" should concern all New York residents, but especially "more vulnerable populations" such as "undocumented customers," Cindy Rubi Estrada, *New York City Hispanic Chamber of Commerce Letter to Protect Consumers and Businesses*, Harlem World Mag. (July 27, 2021), https://bit.ly/3yw7f6U, and the LGBTQ community, which "already face[s] heightened risk in navigating confidentiality and security in an online environment," Matt Tracy, *Council Passes Restaurant Data Sharing Bill Opposing By GMHC, NGLCC*, GayCityNews (July 29, 2021), https://bit.ly/3mNHAES.

Some New York City Council Members recognized these concerns. Council Member Yeger explained that the Ordinance "weaponize[ed] . . . the pandemic for purposes of attacking an industry that we don't like," noting he could not support "hiding under COVID as a reason for data to transmit from one party to another." Ex. 10 at 45:12–20 (July 29 Council meeting transcript). Council Member Yeger further criticized the Ordinance for establishing "in essence a contract of adhesion" by "forcing" the disclosure of customers' private data to restaurants "that may not have the kind of secure platforms that the app companies have." Ex. 9 at 15:5–16:5. Moreover, there was a "very simple" alternative for the purported imbalance of data between restaurants and third-party platforms: Restaurants could "put a menu in the [delivery] bag" inviting consumers to "sign up to our mailing list," and let *consumers* decide whether they want to take restaurants up on their

offer.  *Id.* at 15:9–13.[4]  Council Member Yeger was joined by five other colleagues who voted against the Ordinance, but they were outvoted by 35 Council Members who sought to create "balance and equity" between third-party platforms and restaurants—no matter the cost.  Ex. 8 at 20:6–10 (statement of Council Member Powers).

## LEGAL STANDARD

Preliminary injunctive relief is warranted where the plaintiff demonstrates a threat of irreparable harm and either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the plaintiff's favor.  *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).  Courts also consider whether the public interest favors an injunction.  *Id.*  Where, as here, the government is the defendant, the "balance of hardships" and "public interest" factors "merge."  *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 469 (S.D.N.Y. 2019).  A likelihood of success requires a greater than 50 percent probability of success, whereas the "serious questions" standard applies where the court "cannot determine with certainty that the moving party is more likely than not to prevail . . . , but where the costs outweigh the benefits of not granting the injunction."  *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34–35 (2d Cir. 2010).

## ARGUMENT

All applicable factors favor a preliminary injunction here.  DoorDash is likely to succeed on *several* constitutional claims and will suffer irreparable harm from the impending violation of

---

[4]    DoorDash also provides restaurants with a simple alternative by offering both its Marketplace platform and its Storefront platform.  On the Marketplace platform, DoorDash facilitates pickup and delivery, and DoorDash owns that customer relationship, including responsibility for the customer's data.  Kaplan Decl. ¶ 7.  On the Storefront platform, restaurants can create a branded online store that facilitates pickup and delivery from restaurants' *own websites*; restaurants in turn create a direct relationship with the consumer, and the consumer can choose to share their personal information directly with the restaurant.  Kaplan Decl. ¶ 7.  When this brief references DoorDash's "platform," it means the Marketplace platform, not the Storefront platform.

its constitutional rights, as well as irreparable harm to its business.  More broadly, DoorDash customers throughout New York City will be harmed by the Ordinance's intrusive data-disclosure requirements.  In such circumstances, the Second Circuit has made clear that the balance of equities and the public interest favor maintaining the status quo and preserving DoorDash's rights pending adjudication on the merits.

## I.    DoorDash Is Likely To Succeed On The Merits.

Although an injunction requires only that any *one* of DoorDash's claims be likely to succeed, DoorDash's claims under the First Amendment, Takings Clause, Contract Clause, and police power are *all* likely to succeed.[5]

### A.    DoorDash Is Likely To Succeed On Its Compelled Speech Claim.

The First Amendment's Free Speech Clause provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I; *see also* N.Y. Const. art. I § 8 ("[N]o law shall be passed to restrain or abridge the liberty of speech.").  This constitutional safeguard protects "'both the right to speak freely and the right to refrain from speaking at all.'" *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)); *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796–97 (1988) (difference "between compelled speech and compelled silence . . . is without constitutional significance").  Because the Ordinance compels DoorDash to communicate constitutionally protected speech—*i.e.*, its customer data—absent compelling grounds for doing so (or narrow tailoring toward that end), the Ordinance violates the First Amendment.

---

[5]    The Ordinance is unlawful for other reasons too.  It violates the Dormant Commerce Clause, due process, and equal protection guarantees.  *See* Compl. ¶¶ 110–24, 135–62.  Because this motion is time-sensitive and in the interest of brevity, DoorDash is limiting its arguments here to certain claims.

1.        **Because the Ordinance is a content-based regulation of protected speech, strict scrutiny applies.**

In assessing the constitutionality of laws burdening speech, courts "distinguish between content-based and content-neutral regulations." *NIFLA*, 138 S. Ct. at 2371. "[C]ontent-based regulation" occurs when a state "'alters the content' of [one's] speech," including by "compelling individuals to speak a particular message." *Id.* (quoting *Riley*, 487 U.S. at 795). Such regulations "'are presumptively unconstitutional,'" and "may be justified only if the government proves that they are *narrowly tailored* to serve *compelling state interests*.'" *Id.* (emphasis added) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

The Supreme Court's decision in *NIFLA* is instructive. There, the Court considered the constitutionality of a California law requiring, among other things, certain licensed medical providers to notify women at the point of care "that California provides free or low-cost services, including abortions, and give them a phone number to call." 138 S. Ct. at 2368. In assessing the appropriate level of scrutiny to apply, the Court found the notice requirement to be "a content-based regulation of speech." *Id.* at 2371. Specifically, "[b]y requiring [the centers] to inform women how they can obtain state-subsidized abortions—at the same time [those centers] try to dissuade women from choosing that option—the licensed notice plainly 'alters the content' of [the centers'] speech." *Id.* at 2371; *see also id.* at 2375 (holding the "licensed notice cannot survive even intermediate scrutiny").

Numerous courts in recent years have applied the "rule," reaffirmed in *NIFLA*, "that content-based regulations of speech are subject to strict scrutiny," 138 S. Ct. at 2371, including in certain commercial contexts. In *CompassCare v. Cuomo*, 465 F. Supp. 3d 122, 140 (N.D.N.Y. 2020), the district court held that a statute compelling disclosure of certain "employee rights and remedies" under New York state law violated the First Amendment. Relying upon *NIFLA*, the

court explained that because "the statute compels Defendants to use language they otherwise would not"—even if only "factual and accurate information"—it "is subject to strict scrutiny." *Id.* at 157 (preliminarily enjoining law under that standard). Likewise, in *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1119–21 (9th Cir. 2020), the Ninth Circuit held that a law "prohibit[ing] the dissemination of one type of speech: 'date of birth or age information'" by "commercial online entertainment employment service provider[s]" was subject to strict scrutiny and failed to pass that "exacting form of review."[6]

The same rigorous standard applies here. The Ordinance compels DoorDash, under threat of significant civil penalty, to disclose sensitive "customer data"—like customer names, telephone numbers, delivery addresses, email addresses, and order contents—that such platforms would otherwise strictly safeguard and refrain from communicating. *See* NYC Int. 2311-A § 1 (July 29, 2021). Because the Ordinance compels "the publication of specific content, by specific speakers," it is a content- and speaker-based regulation of speech "that is subject to strict scrutiny." *IMDb.com*, 962 F.3d at 1117, 1119; *see McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (statute is content-based if government must "examine the content of the message that is conveyed to determine whether a violation has occurred" (quotation marks omitted)).

Any argument that the Ordinance does not burden protected speech because it merely involves compelled disclosure of *factual information* fails. The Supreme Court has emphasized that there is no constitutional difference between "compelled statements of opinion" and

---

[6] Both the Fourth Circuit and Eleventh Circuits have similarly applied *NIFLA* in striking down content-based regulations of speech. *See Wash. Post v. McManus*, 944 F.3d 506, 520 (4th Cir. 2019) ("declin[ing] to decide whether strict or exacting scrutiny should apply" to content-based disclosure law mandating certain online platforms to publish identifying and contact information for political-ad purchasers, holding the law was likely to fail even under "the exacting scrutiny standard" and therefore affirming preliminary injunction enjoining law's enforcement); *Otto v. City of Boca Raton*, 981 F.3d 854, 859 (11th Cir. 2020) (ordinances prohibiting therapists from engaging in counseling "with a goal of changing a minor's sexual orientation," among other things, were "content-based regulations of speech that cannot survive strict scrutiny").

"compelled statements of fact" because "either form of compulsion burdens protected speech." *Riley*, 487 U.S. at 797–98 (quotation marks omitted). The "general rule[] that the speaker has the right to tailor the speech[] applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). Thus, "'even dry information, devoid of advocacy, political relevance, or artistic expression'"—like the customer data at issue here—falls within the First Amendment's purview. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (quoting *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 271–72 (2d Cir. 2010)). In *Sorrell*, for example, the Court struck down content- and speaker-based restrictions on the sale, disclosure, and use of (wholly factual) "prescriber-identifying information" by pharmacies and pharmaceutical manufacturers, declining the state's request "for an exception to the rule that information is speech." 564 U.S. at 571. No such "exception" is warranted here either.

Nor can the City claim the Ordinance merely regulates *conduct* rather than protected speech. On this point, the Supreme Court's decision in *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144 (2017), is instructive. There, the Second Circuit had found a law prohibiting sellers from "impos[ing] a surcharge" for the use of a credit card to "pose[] no First Amendment problem because [it] regulated conduct, not speech." *Id.* 1147, 1150. The Supreme Court reversed, holding the law regulates "how sellers may *communicate* their prices . . . rather than prices themselves," and thereby "regulates speech" and not merely "conduct." *Id.* at 1151 (emphasis added). Here, similarly, in proclaiming that third-party platforms "shall" communicate "applicable customer data" to restaurants, the Ordinance "regulat[es] the communication of [data]" and thereby "regulates speech" under the First Amendment. *Id.*; *see also W. Watersheds Project v. Michael*, 869 F.3d 1189, 1195–96 (10th Cir. 2017) ("collection of resource data constitutes the

protected creation of speech") (citing *Sorrell*, 564 U.S. at 570).  And such content-based regulation is subject to strict scrutiny.

### 2.    The Ordinance fails strict-scrutiny review because it serves no compelling interest and is not narrowly tailored in any event.

To withstand strict scrutiny, "the state must show that the statute 'furthers a compelling governmental interest and is narrowly tailored to that end.'"  *IMDb.com*, 962 F.3d at 1125 (quoting *Reed*, 135 S. Ct. at 2231).  The City cannot meet this "demanding standard" here, *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011), where the City Council has made clear that its intent is merely to increase restaurants' profits by making it easier for them to market directly to customers and avoid paying marketing fees to third-party platforms like DoorDash.  Those ends are not a legitimate government interest, let alone a *compelling* one.  *See Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) (strict scrutiny requires furthering "only those interests of the highest order").

In a report issued through the Governmental Affairs Division, the City's Committee on Consumer Affairs and Business Licensing (the "Committee") made clear that the Ordinance had been proposed to economically advantage restaurants at the expense of third-party platforms like DoorDash.  The report acknowledges that third-party platforms acquired customer data through "their [own] products" and use that data "to enhance their own services."  Ex. 6 at 10, 12.  By compelling third-party platforms to communicate that valuable information to restaurants, the bill would be "a useful mechanism to *drive future profits for restaurant owners*," including by enabling better "marketing outreach" to "[i]nfrequent or new customers," as well as new avenues for "growing the loyalty of . . . existing customers."  *Id.* at 10–11 (emphasis added) (asserting such customer data "is crucial" to restaurants' ability to "offer[] promo codes, new menu items, or special discounts").

A second Committee report accompanying the final bill again underscored the bill's intent to enrich restaurants at the expense of third-party platforms. This report, like the first, acknowledged that third-party platforms have been "a crucial lifeline to New York City's restaurants" during the COVID-19 pandemic and that restaurants "mutual[ly] benefit[ted]" from "online ordering and delivery." Ex. 11 at 4–5. But the Committee felt it had to do "all [it] can" to "assist the restaurant industry." *Id.* at 3. Claiming that third-party platforms had earned "hefty rewards" from New York City residents ordering food through their platforms, *id.* at 4, the Committee sought to redistribute those revenues to the "food and restaurant industry," *id.* at 2, by breaking up third-party platforms' "monopoliz[ation]" of data about their own customers, and thereby lessening these platforms' purported "advantage over the restaurants," *id.* at 9.

Statements from individual City Council Members echo these sentiments. For example, Council Member Keith Powers, the Ordinance's chief sponsor, said the bill's "intention" is to create "balance and equity between" third-party platforms and restaurants, Ex. 8 at 20:6–10, as "part of an effort . . . to really help our restaurant industry" and "support our restaurants and bars," Ex. 9 at 9:15–23, 11:10–11. And Speaker Corey Johnson similarly explained that the Ordinance's purpose was to play economic favoritism by "creat[ing] an equitable playing field between [third-party] platforms and the restaurants," bolstering the latter's "ability to fully profit on delivery orders." Ex. 10 at 19:5–7; *see also* Ex. 8 at 54:23–24 (Council Member Reynoso stating the Council "should be" "look[ing] out for the restaurants" when considering laws governing their relationship with third-party platforms). These stated ends are not sufficiently compelling to withstand strict scrutiny.

In any event, even if the Ordinance's stated goals were "of the highest order," *Yoder*, 406 U.S. at 215, the Ordinance is not narrowly tailored to achieve its ends. The City undoubtedly could

"drive future profits for restaurant owners" (Ex. 6 at 10–11) in myriad ways "'without burdening a speaker with unwanted speech.'"  *NIFLA*, 138 S. Ct. at 2376 (quoting *Riley*, 487 U.S. at 800). What's more, the Ordinance will likely have the perverse result of *harming* the very businesses it purports to help.  Restaurants' use of third-party platforms' customer data would erode those platforms' customer base and marketing revenue, forcing them to increase the fees they charge consumers who place delivery orders, or else modify their services in a way that will result in fewer resources being offered to restaurants, fewer earnings opportunities for delivery couriers, and fewer choices for New York City customers.  Kaplan Decl. ¶¶ 30–36.  DoorDash's experience with the Fee Cap during the pandemic has borne this out—platforms facilitated fewer orders because of increased consumer-facing costs in certain jurisdictions.  Kaplan Decl. ¶ 34.  The same result is likely here, and restaurants and customers alike will suffer as a result.

> ### 3.    Commercial speech standards of review do not apply because the compelled communications here are non-commercial speech.

*NIFLA* reaffirmed that "content-based regulations of speech are subject to strict scrutiny," even when the speech at issue is commercial in nature.  138 S. Ct. at 2371.  Any exceptions to that rule drawn by prior precedents must be construed narrowly, according to their precise terms.  *See id.* at 2372 ("This Court has 'been reluctant to mark off new categories of speech for diminished constitutional protection.'").  To the extent the City attempts to invoke *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)—or another commercial-speech doctrine like *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.*, 447 U.S. 557 (1980)—those efforts would fail.

*First*, pre-*NIFLA* precedents applying *Zauderer* in the Second Circuit do so in the context of commercial-speech regulation, which is not at issue here.  The "core notion of commercial speech" is that it "does 'no more than propose a commercial transaction.'"  *Bolger v. Youngs Drug*

16

*Prods. Corp.*, 463 U.S. 60, 66 (1983) (citation omitted); *see also Zauderer*, 471 U.S. at 637 ("commercial speech doctrine rests heavily on 'the "common-sense" distinction between speech proposing a commercial transaction . . . and other varieties of speech'").  Whether a regulation concerns commercial speech depends on a number of factors, "such as [1] whether the communication is an advertisement, [2] whether the communication makes reference to a specific product, and [3] whether the speaker has an economic motivation for the communication." *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 97 (2d Cir. 1998) (citing *Bolger*, 463 U.S. at 66–67).  Thus, for example, the Second Circuit has applied commercial-speech doctrines like *Zauderer* in a variety of consumer-facing contexts, such as laws compelling "disclosure of calorie information [to consumers] in connection with a proposed commercial transaction," *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 131 (2d Cir. 2009), "label[ing]" of some products "to inform consumers that the products contain mercury," *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 107 (2d Cir. 2001), and disclosure to debtors of applicable fees, payment terms, and services offered, *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 94 (2d Cir. 2010) (citing *Bolger*, 463 U.S. at 66).

Here, in contrast, the Ordinance's compelled communications cannot reasonably be considered commercial speech.  Specifically, the communications (1) are *not* "a form of advertising" (or any other consumer-facing communication), (2) do *not* "identify a specific product," and (3) do *not* "serve the economic interest of the speaker," *Bad Frog Brewery*, 134 F.3d at 97—indeed, they do just the opposite, with the stated aim of serving the restaurant industry's economic interests at third-party platforms' expense.  Because the Ordinance regulates *non-*commercial speech, commercial-speech doctrines like *Zauderer* do not apply.  *See, e.g.*, *PSEG Long Island LLC v. Town of N. Hempstead*, 158 F. Supp. 3d 149, 166 (E.D.N.Y. 2016) (challenge

to requirement to place warning signs on utility poles subject to strict scrutiny because signs were non-commercial speech).

*Second*, even if the Ordinance's targeted speech were somehow considered commercial, *Zauderer* would not be the appropriate commercial-speech standard.  As the Court explained in *NIFLA*, *Zauderer* must be "limited to 'purely factual and uncontroversial information about the *terms under which … services will be available*,'" *NIFLA*, 138 S. Ct. at 2372 (emphasis added) (quoting *Zauderer*, 471 U.S. at 651), and simply "does not apply outside of these circumstances." *Id.* (citing *Hurley*, 515 U.S. at 573); *see also Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 263–64 (2d Cir. 2014) ("[A]ll of our case law applying *Zauderer* review to factual, commercial disclosure—indeed, as far as we know, all federal cases applying *Zauderer* in that context—has dealt with disclosure requirements about *a company's own products or services*." (emphasis added)).[7]  Because the Ordinance has nothing to do with the *terms* upon which third-party platforms like DoorDash *provide their services to customers*—and instead compels disclosure of sensitive customer data—*Zauderer* has no application here.  *See NIFLA*, 138 S. Ct. at 2372.[8]

### 4.      In any event, the Ordinance also fails under *Zauderer* review.

Even under *Zauderer*, compelled disclosure mandates must "remedy a harm that is 'potentially real not purely hypothetical,'" and may "extend 'no broader than reasonably necessary.'"  *NIFLA*, 138 S. Ct. at 2377 (quotation marks and citations omitted).  The City would

---

[7]    Separately, *Zauderer* also does not apply here because the Ordinance is not directed at *misleading* or *deceptive* advertising.  *See Zauderer*, 471 U.S. at 651 ("[B]ecause disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, 'warnings or disclaimers might be appropriately required ... in order to dissipate the possibility of consumer confusion or deception.'").

[8]    At minimum, if any commercial-speech doctrine were to apply in the Second Circuit, it would be *Central Hudson*'s "intermediate scrutiny" standard, "because the disclosure required here compels speech that goes beyond the speaker's own product or service."  *Safelite*, 764 F.3d at 264 (applying intermediate scrutiny under *Central Hudson* and preliminarily enjoining law effectively requiring promotional "mention[s] [of one's own] affiliates" to be accompanied by "advertisements for a competitor").

thus bear the burden under *Zauderer* of proving that the Ordinance is "neither unjustified nor unduly burdensome." *Id.* It cannot carry that heavy burden here.

*First*, the Ordinance's customer-data disclosure requirement is plainly unjustified. It is not supported by any legislative findings, let alone any findings suggesting the Council's concerns with third-party platforms' "hefty rewards" and "monopoliz[ation]" of their own customer data is anything "more than 'purely hypothetical.'" *NIFLA*, 138 S. Ct. at 2377. And the City Council "point[ed] to nothing suggesting" that the Ordinance would actually advance its stated interest in benefitting restaurants at third-party platforms' expense. *Id.*

*Second*, "[e]ven if [the City] had presented a nonhypothetical justification for the [Ordinance]," the Ordinance "unduly burdens protected speech." *NIFLA*, 138 S. Ct. at 2377. Platforms like DoorDash would likely be forced to make major changes to their business model to account for the lost revenue that would result from the Ordinance's enforcement. Kaplan Decl. ¶ 34.

* * * * *

Because the Ordinance compels disclosure of fully protected, non-commercial speech without providing a compelling state interest for doing so (or narrow tailoring towards achieving such ends), it violates the First Amendment.

### B. DoorDash Is Likely To Succeed On Its Takings Clause Claim.

The Takings Clause of the Fifth Amendment, applicable here through the Fourteenth Amendment, prohibits New York City from taking "private property" for "public use, without just compensation." U.S. Const. amend. V; *see also* N.Y. Const. art. I, § 7 ("Private property shall not be taken for public use without just compensation."). The Constitution's "protection of property rights is necessary to preserve freedom and empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." *Cedar Point Nursery*

*v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (quotation omitted).  DoorDash's customer data is private property protected by the Takings Clause because it constitutes trade secrets.  And the Ordinance violates the Takings Clause in two distinct ways.  First, it extinguishes DoorDash's right to exclude others from access to its trade secret information.  Second, it is the kind of law that the Takings Clause has indisputably prohibited since the Constitution's enactment:  "a law that takes property from A and gives it to B."  *Calder v. Bull*, 3 U.S. 386, 388 (1798) (Chase, J.); *see Kelo v. City of London*, 545 U.S. 469, 477 (2005) ("[T]he City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party.").

### 1. DoorDash's customer data is protected property under the Takings Clause.

When "data [is] cognizable as a trade-secret property right under [state] law, that property right is protected by the Takings Clause."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04 (1984).  A trade secret is a protected property right because the "right to exclude" is "one of the most essential sticks in the bundle of rights that are commonly characterized as property," *Cedar Point Nursery*, 141 S. Ct. at 2072, and the "economic value of" trade secrets "lies in the competitive advantage over others that [the company] enjoys by virtue of exclusive access to the data," *Ruckelshaus*, 467 U.S. at 1011–12.  "[D]isclosure or use by others of the data would destroy that competitive edge," and in turn destroy the right to exclude.  *Id.* at 1012.

The customer data that the Ordinance forces DoorDash to disclose—*i.e.*, customer name, telephone number, delivery address, email address, and order contents—constitutes a protectable trade secret.  "Numerous cases" have concluded that "customer lists," including information about customers, are "protectable trade secrets" because they allow companies to grow and develop their business.  *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (collecting cases); *see also*, *e.g.*, *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (reversing

denial of preliminary injunction for trade secrets claim related to "customer lists"); *Philliben v. Uber Techs., Inc.*, 2016 WL 9185000, at *3 (N.D. Cal. Apr. 15, 2016) ("[I]nformation directly related to Uber's consumer base . . . is valuable to Uber's business and could be used by Uber's competitors to Uber's disadvantage"); *Nu-Chem Labs., Inc. v. Dynamic Labs., Inc.*, 2001 WL 35981560, at *16 (E.D.N.Y. Mar. 30, 2001) (finding "customer purchase histories" containing the "customer's name, address, telephone number, . . . date of first purchase, . . . and prices paid" to be a "trade secret").

New York law defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [one] an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1013 (N.Y. 1993). Courts consider six factors in determining whether something is a trade secret under New York law:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009). Here, every factor supports the conclusion that DoorDash's customer data is a trade secret.

*First*, the customer data is generally not known outside of DoorDash's business. DoorDash does not generally share customers' name, contact information, and order contents with third parties, with the exception of sharing customer data with service providers who help facilitate DoorDash's services. Kaplan Decl. ¶¶ 13, 24. But in those circumstances, DoorDash reviews security procedures and implements contractual protections to safeguard customer data. *Id.* ¶ 24. For example, service providers are contractually obligated to implement reasonable security

measures to protect DoorDash's customer data, and they cannot use that data for purposes other than to facilitate DoorDash's services. *Id.* Accordingly, it "would be very difficult if not impossible" for competitors to "discover" the customer data that the Ordinance requires to be disclosed. *FMC Corp.*, 730 F.2d at 63.

*Second*, the customer data is not generally known by others involved in the business, and DoorDash has implemented a variety of controls to ensure its employees preserve the confidentiality of DoorDash's customer data. For example, DoorDash performs access reviews to regularly assess which employees have access to DoorDash tools and data. Kaplan Decl. ¶ 23. In addition, employees sign confidentiality agreements and agree to corporate privacy policies that govern their access to DoorDash data. *Id.* DoorDash also runs a data-loss prevention program, which enables DoorDash to determine if, for example, employees are exporting data via email or other processes. *Id.* Because DoorDash has "strictly limited the access of its own employees to the information," this factor favors protecting DoorDash's customer data as a trade secret. *Faiveley*, 559 F.3d at 117; *Churchill Comm'ns Corp. v. Demyanovich*, 668 F. Supp. 207, 213 (S.D.N.Y. 1987) (similar reasoning as to "customer lists").

*Third*, DoorDash has implemented measures to keep the customer data secret. DoorDash has invested heavily in privacy and cybersecurity. It also takes significant measures to protect its customer data, such as implementing access controls and organizational policies, using identity-access management systems that require multi-factor authentication tools to access information, and deploying threat-detection tools to safeguard DoorDash networks, systems, and data. Kaplan Decl. ¶ 22. These measures show that DoorDash "made clear the importance of maintaining the confidentiality of [its] client contact list," which favors trade secret protection. *N. Atl. Instruments*, 188 F.3d at 47.

*Fourth*, the customer data has independent economic value to DoorDash, and allows DoorDash to obtain an advantage over competitors who do not possess the same data. With its customer data, DoorDash can ascertain consumer trends regarding the types of food they order and from what types of restaurants. Kaplan Decl. ¶¶ 19–20. This in turn allows DoorDash to better serve customers by providing relevant offerings that appeal to consumers based on their order preferences (among other things). *Id.* ¶ 20. It also enables DoorDash to offer the appropriate amount of services to busy areas and restaurants. Kaplan Decl. ¶ 20. By keeping this data private, DoorDash is able to offer (and earn revenue from) powerful, proprietary marketing tools that depend on the data. *Id.* ¶ 19. Indeed, restaurants often opt for enhanced marketing on DoorDash's platform because such marketing, built upon the same customer data the Ordinance requires DoorDash to communicate to restaurants, provides tremendous commercial value. *Id.*

If restaurants and other third parties had access to DoorDash's customer data, the value of DoorDash's services would diminish considerably. Restaurants could use DoorDash's customer data, including customers' "order histories," to "contact the customers directly and cut out the need for" an intermediary—in effect, "to steal the business." *Shamrock Power Sales, LLC v. Scherer*, 2015 WL 5730339, at *3, *26 (S.D.N.Y. Sept. 30, 2015) (finding equipment seller's list of customers to be a protected trade secret). Indeed, the Ordinance explicitly tries to cut DoorDash out of the picture by letting restaurants "use [DoorDash's] data when it comes to marketing" their own business by contacting DoorDash customers directly. Ex. 8 at 19:25–20:15; *see also supra*, at 6–7.

*Fifth*, DoorDash has expended considerable effort and money in attracting customers to its platform. The "most expensive thing to replicate is [a business's] relationship with [its] customers," *N. Atl. Instruments*, 188 F.3d at 46 (quoting company official), and DoorDash has

invested heavily in building relationships with its customers by spending tens of millions of dollars each year in advertising to increase and retain its customer base.  Kaplan Decl. ¶ 21; *see Leo Silfen, Inc. v. Cream*, 278 N.E.2d 636, 640 (N.Y. 1972) (holding customer information protected as trade secret "where the customers' patronage had been secured by years of effort and advertising"); *DDS, Inc. v. Lucas Aerospace Power Transmission Corp.*, 182 F.R.D. 1, 5 (N.D.N.Y. 1998) (holding "customer lists" were protected trade secrets where the company "expended significant efforts to find [customers] through research and advertising").

*Sixth and finally*, restaurants (or other third parties) cannot easily acquire or duplicate DoorDash's customer data.  If they could, there would be no need for this legislation.  The "only basis" on which restaurants could have "knowledge of the customer information" would be from the Ordinance giving them "direct exposure" to it.  *N. Atl. Instruments*, 188 F.3d at 46.

In sum, where "it would be difficult to duplicate a customer list"—which is the case here, as evidenced by the great (and unconstitutional) lengths to which the City will go to coopt DoorDash's customer data for others' use—"[n]umerous cases applying New York law have held that . . . trade secret protection should apply."  *N. Atl. Instruments*, 188 F.3d at 46.  The Court should do the same here.

### 2.   The Ordinance is a taking.

The Ordinance "effects a taking" of DoorDash's private property.  *Sherman v. Town of Chester*, 752 F.3d 554, 564 (2d Cir. 2014).  There are "two species of takings:  physical takings and regulatory takings."  *Id.*  This case concerns a regulatory taking, which occurs "when the government acts in a regulatory capacity."  *Id.*  Regulatory takings "are further subdivided into categorical" takings—also called *per se* takings—and "non-categorical takings."  *Id.*  The Ordinance is both a categorical and non-categorical taking.

### a) The Ordinance is a categorical or "per se" taking.

"[R]egulatory action" is considered a "*per se* taking" where it "completely deprive[s] an owner of all economically beneficial use" of the owner's property. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (quotation marks omitted). *Per se* takings violate the Takings Clause "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35 (1982).

Because a trade secret owner's right of exclusive use is the sole source of value in trade secret property, and because the Ordinance destroys that right, the Ordinance effects a *per se* taking. *See Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 51 (1st Cir. 2002) (Selya, J. concurring in the judgment) (concluding that a state law requiring the disclosure of trade secrets constituted a "per se taking" in addition to a non-categorical taking).

As discussed, the term "property" in the Takings Clause is not a reference to the "physical thing" itself, but rather "denote[s] the group of rights" a citizen has. *Ruckelshaus*, 467 U.S. at 1003. The "right to exclude" is an "essential" stick in that bundle of rights. *Cedar Point Nursery*, 141 S. Ct. at 2072. For trade secrets, the right to exclude means everything. The "economic value of" trade secrets "lies in the competitive advantage over others that [the company] enjoys by virtue of exclusive access to the data, and disclosure or use by others of the data would destroy that competitive edge." *Ruckelshaus*, 467 U.S. at 1011–12.

The Ordinance destroys DoorDash's right to exclude others from its customer data, and thus destroys the intrinsic value of its trade secret. The Ordinance compels DoorDash to disclose its customer data to restaurants, leaving DoorDash with no choice but to hand over its closely guarded trade secrets. This "required acquiescence," in which DoorDash must "permit another to exercise complete dominion" over its own customer data, "is qualitatively more severe than a

regulation of the use of property." *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987).  And when that disclosure happens, DoorDash's property interest in the customer data is extinguished. *See FMC Corp.*, 730 F.2d at 63 ("A trade secret once lost is, of course, lost forever.").  By prohibiting DoorDash from making "productive use" of its property that "was previously permissible" under state law, the Ordinance effects a categorical taking.  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029–30 (1992); *see also Philip Morris*, 312 F.3d at 51 (Selya, J. concurring in the judgment).

<strong>b)      The Ordinance is a non-categorical taking.</strong>

If a regulation is not a *per se* taking, it still violates the Fifth Amendment if it is a non-categorical taking under the standard set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).  Under *Penn Central*, courts consider: (1) the extent to which the regulation has interfered with "investment-backed expectations"; (2) the economic impact of the regulation on the property owner; and (3) the character of the governmental action.  *Id.* at 124.  A plaintiff need not show that each factor favors a Takings Clause violation; courts must "[b]alanc[e]" these factors.  *Sherman*, 752 F.3d at 566.  But here, each factor demonstrates a regulatory taking.  *See Ruckelshaus*, 467 U.S. at 1013–14 (holding that government disclosure of proprietary data would violate Takings Clause when the confidentiality was protected by law); *Philip Morris*, 312 F.3d at 45–46 (en banc) (concluding that state law requiring companies to disclose "their trade secrets" "violates the Takings Clause" as a non-categorical taking).

*First*, the Ordinance interfered with DoorDash's reasonable investment-backed expectations.  DoorDash spent millions of dollars to grow its customer base and develop the customer data at issue.  *See supra*, at 4.  DoorDash made these investments because the exclusive use of its customer data allowed DoorDash to build a platform that generated significant value for customers and restaurants alike.  *See supra*, at 23–24.  And DoorDash expected its customer data

to retain this confidentiality-driven value.  The law did not require DoorDash to disclose customer

data to anyone, and DoorDash structured its private contracts with both consumers and restaurants

to ensure that customer data would remain confidential.  *See supra*, at 5.  Because DoorDash had

"an extensive measure of confidentiality and exclusive use" in this data, it had a "reasonable

investment-backed expectation" that it could use that data to help drive its business.  *Ruckelshaus*,

467 U.S. at 1011; *see supra*, at 23.  The Ordinance upended DoorDash's expectations, however,

by allowing restaurants to free ride on the customer data in which DoorDash invested.  DoorDash

"could not have expected" the Ordinance's obliteration of DoorDash's ability to keep confidential

its customer data.  *Sherman*, 752 F.3d at 565.

 *Second*, the Ordinance undermined DoorDash's ability to make "economic use of [its]

property."  *Sherman*, 752 F.3d at 565.  So long as DoorDash's proprietary data is kept confidential,

it holds significant economic value to the company.  *See supra*, at 23.  Now, this data will be forced

into the hands of an untold number of restaurants—which, in turn, will allow restaurants to use

DoorDash's own customer data to compete directly against DoorDash and forgo advertising on

DoorDash's platform.  The economic value of DoorDash's customer data will be eviscerated.

 *Third*, the Ordinance's character is "unfair" and "unreasonable."  *Sherman*, 752 F.3d at

565.  The Takings Clause "prevent[s] the government from forcing some people alone to bear

public burdens which, in all fairness and justice, should be borne by the public as a whole."

*E. Enters. v. Apfel*, 524 U.S. 498, 522 (1998).  But the Ordinance "singled out" DoorDash and

certain other out-of-state third-party platforms to inhibit their ability to "succeed in" the New York

market.  *Sherman*, 752 F.3d at 565.  If New York City believes the restaurant industry requires

economic assistance, that public burden should be borne by the public as a whole, not by third-

party platforms alone.  By placing the "expense" of the regulation "disproportionately on a few

private property owners," the Ordinance "amounts to a taking," and that taking cannot be "rendered any more acceptable by worthiness of purpose." *Cienega Gardens v. United States*, 331 F.3d 1319, 1338–40 (Fed. Cir. 2003).

In any event, the Ordinance serves *no* public purpose. Instead, the Ordinance is expressly intended to take from A (third-party platforms) to give to B (restaurants). *See supra*, at 7. The government cannot do that. *See Kelo*, 545 U.S. at 477; *Calder*, 3 U.S. at 388 (Chase, J.). Adding injury to insult, the Takings Clause requires the government to pay "just compensation" when it takes private property, such as trade secrets, but the Ordinance requires *DoorDash* to pay compensation *to the State*, in the form of a $500 per-day and per-restaurant civil penalty if DoorDash does not disclose its trade secrets upon restaurants' requests. *See* Ex. 10 at 22:4–6.

Further, the City's Fee Cap prevents DoorDash from trying to recoup the value of its trade secrets. Part of DoorDash's value proposition is offering restaurants new customers that DoorDash has spent millions of dollars attracting. The City is compelling DoorDash to give away its property to restaurants *and* prohibiting DoorDash from charging restaurants the fees they agreed to pay.

### C.    DoorDash Is Likely To Succeed On Its Contract Clause Claim.

The Constitution prohibits New York City from impairing the obligations of contracts. U.S. Const. art. I, § 10. The Contract Clause's two-step analysis provides more protection than the Due Process Clause's "less searching" rational basis test. *Pension Fund Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984).

At Step One, courts ask "whether the state law has 'operated as a substantial impairment of a contractual relationship.'" *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018) (quoting *Allied*

*Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)).[9]  This analysis must account for the "high value" that the Framers placed "on the protection of private contracts," which "enable individuals to order their personal and business affairs according to their particular needs and interests.  Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them."  *Spannaus*, 438 U.S. at 245.  Thus, courts "consider[] the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."  *Sveen*, 138 S. Ct. at 1822.  Laws that go beyond "a temporary alteration of the contractual relationships" to "retroactively" "work[] a severe, permanent, and immediate change in those relationships" fail Step One.  *Spannaus*, 438 U.S. at 250.

If a law operates as a substantial impairment, courts turn to Step Two: the law's "means and ends."  *Sveen*, 138 S. Ct. at 1822.  To "guarantee[] that the State is exercising its police power, rather than providing a benefit to special interests," courts ask whether the law is drawn in an "appropriate" and "reasonable" way to advance "a significant and legitimate public purpose." *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–412 (1983).  Laws fail Step Two when, for example, they are "not even purportedly enacted to deal with a broad, generalized economic or social problem" and "invade[] an area never before subject to regulation by the State."  *Spannaus*, 438 U.S. at 250.

The Eighth Circuit recently applied these principles to strike down a law similar to the Ordinance.  In *Association of Equipment Manufacturers v. Burgum* ("*AEM*"), a state prohibited farm equipment manufacturers from imposing certain obligations on dealers "[n]otwithstanding

---

[9]   Municipal ordinances, like state laws, must comply with the Contract Clause.  *See Cuyahoga River Power Co. v. City of Akron*, 240 U.S. 462, 464 (1916).

the terms of any contract." 932 F.3d 727, 729 (8th Cir. 2019).  Other provisions of the law impaired existing contractual obligations despite "not contain[ing] language specifying retroactive application."  *Id.*  The law's co-sponsor conceded that it was intended to create a "level playing field" between manufacturers and dealers.  *Id.* at 729–30.

The district court preliminarily enjoined the law, and the Eighth Circuit affirmed.  At Step One, the Eighth Circuit wrote that the "substantial impairment" analysis "is akin to a question of reasonable foreseeability.  *Id.* at 730.  In *AEM*, the manufacturers could not "reasonably be said to have had a fair and appreciable warning of an impending intervention into their agreements" because previous regulations of manufacturers "forbade primarily coercive and discriminatory practices," whereas the new law went "a significant step beyond regulation of coercive and discriminatory practices by rendering unenforceable obligations that dealers previously accepted as part of freely negotiated contracts."  *Id.* at 730–31.

At Step Two, the law's failure to "include[] well-supported findings" meant that "any significant and legitimate public purpose must be discerned from the design and operation of the legislation itself."  *Id.* at 733.  The court emphasized that "the Contract Clause demands more than incidental public benefits."  *Id.*  The law in *AEM* failed Step Two because it "nowhere mention[ed]" the public, "ha[d] a narrow focus: restricting the contractual rights of farm equipment manufacturers," and "primarily benefit[ed] a particular economic actor in the farm economy."  *Id.*

Like the law in *AEM*, the Ordinance violates the Contract Clause.  At Step One, the Ordinance substantially impairs DoorDash's contractual relationships with thousands of New York City restaurants by requiring DoorDash to divulge valuable trade secrets without any compensation.  In entering into those contracts, DoorDash and restaurants "order[ed] their . . . business affairs according to their particular needs and interests"—including their interests in

customer data. *Spannaus*, 438 U.S. at 245. The resulting "rights and obligations are binding under the law, and the parties are entitled to rely on them," *id.*, but the Ordinance undermines that reliance. DoorDash would have structured its contracts very differently had it known it would be expected to disclose this competitive customer data. Kaplan Decl. ¶¶ 34–36. But DoorDash "had no reason to anticipate" this compelled disclosure—neither the City nor any other jurisdiction had previously required anything remotely comparable. *Spannaus*, 438 U.S. at 245. The Ordinance thus is "a significant step beyond [any existing] regulation" and "render[s] unenforceable obligations that [the parties] previously accepted as part of freely negotiated contracts." *AEM*, 932 F.3d at 730–31.

At Step Two, the Ordinance is not drawn in an appropriate, reasonable way to advance a significant and legitimate public purpose. As one special-interest group said, the Ordinance's goal is to "level[] the playing field" for restaurants. Ex. 7 at 9. And again, the Ordinance's sponsor similarly said that the Ordinance's "intention" was to create "balance and equity between" third-party platforms and restaurants. Ex. 8 at 20:6–10 (Council Member Powers). Such commentary shows that the Ordinance "provid[es] a benefit to special interests" in violation of the Contract Clause. *Energy Reserves*, 459 U.S. at 412; *accord AEM*, 932 F.3d at 733 (law fails Step Two when it "primarily benefits a particular economic actor" within an industry).

Moreover, a separate New York City ordinance that artificially and arbitrarily caps DoorDash's restaurant-facing commissions underscores the Ordinance's inappropriate character. N.Y.C. Admin. Code § 20-846; *see also supra*, at 7 n.3. With no regard for DoorDash's thousands of existing contracts with local restaurants, the City is forcing DoorDash to provide *more* (very valuable, sensitive) data for *less* compensation, with the purpose of decreasing DoorDash's profits

or running it out of the New York City market altogether.  This is exactly the type of conduct the Contract Clause prohibits.

> ### D.  DoorDash Is Likely To Succeed On Its Police Power Claim.

The State of New York has authority under its police power to enact laws protecting the "health," "safety," and "well-being" of its citizens.  N.Y. Const. Art. IX, § 2(c)(1).  That police power extends to cities and other local units of government.  N.Y. Mun. Home Rule § 10.  For a "local law to come within the police power," however, "it must bear a reasonable relationship to the objective sought to be promoted, i.e., public safety, health or welfare."  *Albany Area Builders Ass'n v. Town of Guilderland*, 141 A.D.2d 293, 298 (N.Y. App. Div. 1988).  Because the Ordinance has at most a "tenuous relationship" to health, safety, or the public well-being, it is not a valid exercise of New York City's police power.  *Id.*; *see also Vermont Railway, Inc. v. Town of Shelburne*, 918 F.3d 82, 88 (2d Cir. 2019) (affirming permanent injunction against local law that was an invalid exercise of police power).

Although some Council Members invoked the COVID-19 pandemic as a reason to enact the Ordinance and help restaurants, Ex. 8 at 20, other Council Members recognized such reasoning was pretextual, Ex. 10 at 45:19–20.  And even if Council Members were genuinely acting in response to the COVID-19 pandemic, the Council never said or showed anything to suggest that transferring customer data from third-party platforms to restaurants improves anyone's health or safety.  To the contrary, the Ordinance was self-described as a mechanism to "drive future profits for restaurants owners."  Ex. 6 at 10–11.  But a local law "aimed at raising revenues" "does not directly further [the] objective[s]" of the police power.  *Albany Area Builders*, 141 A.D.2d at 298 (striking down town law); *see also Good Humor Corp. v. City of New York*, 49 N.E.2d 153, 154, 157 (N.Y. 1943) (striking down local law prohibiting peddling "any goods, wares or merchandise

on any of the street of the city," with certain exceptions, because the law "has no reasonable relation to the public health and is not intended to protect articles of food from contamination").

Nor does the Ordinance protect the *public* "welfare," because it is "designed for the convenience and interest of a special class." *People v. Cohen*, 5 N.E.2d 835, 835 (N.Y. 1936).  In *Cohen*, a New York City ordinance prohibited the sale of fruits and vegetables "within 36 inches" of certain businesses on Broadway.  *Id*.  The New York Court of Appeals struck down the law because its "purpose" was "to favor real estate values" in a particular "section of the city"; that kind of economic favoritism "bears no relation to the welfare of the public," and is not a valid exercise of the police power.  *Id*.  So, too, here.  The Ordinance was not aimed at benefitting the public as a whole.  To the contrary, the Ordinance was expressly "designed for the convenience and interests of a special class"—restaurant owners.  *Id.* at 322.  Moreover, the Ordinance does not require *all* entities that partner with restaurants to disclose their customer data, but *only* third-party platforms.  "These features of the [Ordinance] plainly show its purpose" was not to protect the public welfare, but to protect "local [restaurants] from competition," which is not a valid exercise of the police power.  *People ex rel. Moskowitz v. Jenkins*, 94 N.E. 1065, 1067 (N.Y. 1911) (striking down a local law that imposed a $100 monthly license fee on "transient retail business[es]" but not on "department shops of New York").

## II.   DoorDash Will Suffer Irreparable Harm Absent A Preliminary Injunction.

To obtain a preliminary injunction, the Second Circuit requires only "a *threat* of irreparable harm, not that irreparable harm already [has] occurred."  *Mullins v. City of N.Y.*, 626 F.3d 47, 55 (2d Cir. 2010).  Absent injunctive relief, DoorDash faces an imminent threat of irreparable harm for at least three reasons.

*First*, DoorDash will suffer irreparable harm "from a possible deprivation of . . . [its] constitutional rights."  *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992); *Agudath Israel of Am.*

*v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) ("[A] presumption of irreparable injury . . . flow[s] from a violation of constitutional rights") (citation and quotation marks omitted).  No more is needed to sufficiently demonstrate irreparable harm.  *See, e.g.*, *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009); *Jolly*, 76 F.3d at 482.  Indeed, as the Supreme Court recently held, "[t]he loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury."  *Roman Catholic Diocese of Brooklyn, N.Y. v. Cuomo*, 141 S. Ct. 63, 68 (2020) (*per curiam*) (emphasis added) (citation and quotation marks omitted); *see also Abdul Wali v. Coughlin*, 754 F.2d 1015, 1026 (2d Cir. 1985).

*Second*, once the customer data required by the Ordinance is disclosed to restaurants with little restriction on its use, there will be no way to undo the damage to DoorDash, even if DoorDash ultimately prevails on the merits of its challenge.  Such "disclosure of confidential information" is "the quintessential type of irreparable harm that cannot be compensated or undone by money damages," and is thus "both substantial and irreversible" harm justifying "preliminary injunctive relief."  *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000); *see also Airbnb, Inc. v. City of N.Y.*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) (granting preliminary injunction under similar theory of irreparable "constitutional and commercial harms").  Again, for this reason alone, a preliminary injunction should issue.

*Third*, absent injunctive relief, DoorDash would face an untenable choice of three options. It could try to *comply* with the Ordinance's unlawful demands—a path that would irreversibly disclose sensitive and protected information to restaurants, compel the dissemination of DoorDash's trade secrets, and lead to reputational harm and a loss of business and goodwill.  *See Register.com, Inc. v. Verio Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (irreparable harm through "loss of reputation, good will, and business opportunities").  Or DoorDash could *defy* the Ordinance and

face $500-per-violation fines, which "accrue on a daily basis for each day and for each" restaurant with respect to which a violation occurred.  NYC Int. No. 2333-A (amending Admin. Code. § 20-848).  DoorDash has contracts with 16,000 New York City restaurants, thus exposing it to tens of thousands of dollars per day in fines.  This "readily" constitutes irreparable harm.  *Satellite Television of N.Y. Assocs. v. Finneran*, 579 F. Supp. 1546, 1551 (S.D.N.Y. 1984) (finding irreparable harm in light of $2,000-per-day fine for violating law).  As a final alternative, DoorDash could *cease conducting its lawful business enterprise* in New York City.  Preliminary injunctive relief is designed to protect parties from being forced into these impossible choices while the validity of an ordinance is being litigated.  *See*, *e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (irreparable injury where plaintiffs faced "Hobson's choice": "continually violate" the preempted law and "expose themselves to potentially huge liability" or "suffer the injury of obeying the law during the pendency of" litigation).

## III.    The Public Interest And Balance Of Equities Support An Injunction.

Finally, the Court must consider "the balance of equities and public interest," which "merge" when "the Government is the opposing party."  *Hernandez Aguilar v. Decker*, 482 F. Supp. 3d 139, 150 (S.D.N.Y. 2020) (quotation marks omitted).

*First*, the balance of the equities weighs in favor of a preliminary injunction.  Absent a preliminary injunction, DoorDash's First Amendment rights, its trade secrets, and its contracts will be impaired.  *See supra*, at 10–31.  In contrast, the City of New York would not be saddled with any additional burdens if a preliminary injunction issues, and "the City does not have an interest in the enforcement of an unconstitutional law."  *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 470 (S.D.N.Y. 2019).  Even if there is some non-"trivial" "cost of the preliminary injunction" on the City, that "is a cost that the [City] chose to bear" when it enacted the law and burdened constitutional rights.  *Yang v. Kosinski*, 960 F.3d 119, 136 (2d Cir. 2020).  And if there

is "any conflict between the state's financial or administrative concerns . . . and the risk of substantial constitutional harm to plaintiffs," there is "little difficulty" concluding that the "balance of hardships tips decidedly in plaintiffs' favor." *Mitchell v. Cuomo*, 748 F.2d 804, 807–08 (2d Cir. 1984); *see also Hernandez Aguilar*, 482 F. Supp. 3d at 150 (similar).

*Second*, "the public interest is well served by the correction of th[e] constitutional harm[s] caused by the Ordinance. *A.H. v. French*, 985 F.3d 165, 184 (2d Cir. 2021); *see also, e.g.*, *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("securing First Amendment rights is in the public interest"); *Marquez v. Annucci*, 2020 WL 3871362, at *6 (S.D.N.Y. July 9, 2020) ("public interest is best served by ensuring th[at] constitutional rights . . . are upheld" (quotation marks omitted)).  That alone is sufficient.  *See id.*

The public interest favors an injunction for an additional reason:  The Ordinance is an invasive intrusion of consumers' privacy rights, and New York City residents will suffer harm absent injunctive relief.  As soon as the law takes effect, restaurants will start collecting consumers' sensitive personal information.  Many of those restaurants will not have the proper technological systems or resources to safeguard such information, thereby exposing it to risk of a data breach. Moreover, compelling disclosure of sensitive data that most consumers would not expect to provide to restaurants will inevitably lead to a deluge of unwanted spam calls, texts, and emails. *See supra*, at 8.  Giving "financial support" to restaurants may be a laudable goal, but "not if it comes at the cost of increased spam, identity theft, and stalking."  Albert Cahn & Dana Levy, *Surveillance and The City:  NYC's Delivery Data Dilemma*, Gotham Gazette (July 16, 2021), https://bit.ly/2Y2n2hj.   Moreover, the Ordinance could imperil the safety of vulnerable communities in New York City.  As the National LGBT Chamber of Commerce and the Gay Men's Health Crisis explained, the Ordinance "jeopardizes sensitive LGBT business owner and

other consumers' data," which is "particularly problematic for a community that has already faced heightened risk in navigating confidentiality and security in an online environment."  Matt Tracy, *Council Passes Restaurant Data Sharing Bill Opposed By GMHC, NGLCC*, GayCityNews (July 29, 2011), https://bit.ly/3jrDXCd.

Given the widespread concerns raised about the Ordinance's harmful effects on New York City residents, it is in the public interest to issue an injunction and preserve the status quo.

## IV.    DoorDash Should Not Be Required To Post A Bond.

No security is necessary for the granting of this motion, as the City of New York will not suffer any loss or damage through a wrongful injunction.  Fed. R. Civ. P. 65(c); *see Doctor's Associates, Inc. v. Distajo*, 107 F.3d 126, 236 (2d Cir. 1997) ("Rule 65(c) gives the district court wide discretion . . . to dispense with the bond requirement where there has been no proof of likelihood of harm"); *725 Eatery Corp.*, 408 F. Supp. 3d at 470 ("this Court waives the Rule 65(c) bond requirement" in issuing preliminary injunction against City of New York regulations subject to constitutional challenges).

### CONCLUSION

This Court should preliminarily enjoin the Ordinance before it takes effect on December 27, 2021.

Dated:    September 15, 2021          Respectfully submitted,
     New York, New York

                                   GIBSON, DUNN & CRUTCHER LLP

                               By:  /s/ Anne Champion
                                   Anne Champion
                                   200 Park Avenue, 47th Floor
                                   New York, NY  10166-0193
                                   Telephone:  (212) 351-4000
                                   AChampion@gibsondunn.com

Joshua S. Lipshutz (*pro hac vice forthcoming*)
1050 Connecticut Ave. NW
Washington, DC 20036-5306
Telephone:  (202) 955-8500
JLipshutz@gibsondunn.com

*Attorneys for Plaintiff DoorDash, Inc.*